In the Matter of **PESTER REFINING COMPANY, Debtor.**

**PESTER REFINING COMPANY, Plaintiff,**

and

**Continental Illinois National Bank and Trust Company of Chicago, First Interstate Bank of Denver, N.A., Bankers Trust Company, Inland Crude Purchasing Corporation, and Official Unsecured Creditors Committee of Pester Refining Company, Plaintiffs-Intervenors,**

v.

**MAPCO GAS PRODUCTS, INC. and Mid-America Pipeline Company, Defendants.**

**BURKE ENERGY CORPORATION, Plaintiff,**

v.

**PESTER REFINING COMPANY, Defendant,**

**PESTER REFINING COMPANY, Counterclaimant and Third-Party Plaintiff,**

v.

**BURKE ENERGY CORPORATION, Counterdefendant,**

and

**Mid-America Pipeline Company, Third-Party Defendant,**

**Continental Illinois National Bank and Trust Company of Chicago, First Interstate Bank of Denver, N.A., Bankers Trust Company, Inland Crude Purchasing Corporation, Southern Union Refining Company, and Official Unsecured Creditors Committee of Pester Refining Company, Intervenors.**

Bankruptcy No. 85–340–C.
Adv. Nos. 85–0203, 85–0048.

United States Bankruptcy Court, S.D. Iowa.

July 9, 1986.

See also, Bkrtcy., 58 B.R. 189.

James A. Chatz, Chicago, Ill., and John G. Fletcher, Des Moines, Iowa, for debtor.

Harry D. Dixon, Omaha, Neb., and T. Randall Wright, Wichita, Kan., for Official Unsecured Creditors Comm.

Robert A. Gamble and Julie Johnson McClean, Des Moines, Iowa, for Bank Group.

Harold Kaplan, Theodore Livingston and Janice M. Powell, Chicago, Ill., for Continental Illinois.

William J. Baum, Denver, Colo., for First Interstate.

Frank L. Burnette, II, Des Moines, Iowa, for Inland Crude Purchasing Corp.

Thomas L. Flynn, Des Moines, Iowa, for Southern Union Refining Co.

F. Richard Lyford, Des Moines, Iowa, for Burke Energy Corp.

Herschel Langdon, Richard Steffen, Des Moines, Iowa, W. Michael Shinkle, Davenport, Iowa, and Royse M. Parr, Tulsa, Okl., for Mapco Gas Products, Inc. and Mid-America Pipeline Co.

## MEMORANDUM OF DECISION

RICHARD STAGEMAN, Bankruptcy Judge.

The matters before the court are two adversary proceedings that were consol-

idated for trial. The issues involved include a complaint for turnover of property of the estate, for money damages incurred by conversion of estate property, and counterclaims for reclamation. A motion to compel assumption or rejection of an executory contract has also been consolidated with the adversary proceedings.

The trial on these matters was held March 5 and 6, 1986. Pretrial and post-trial briefs have been submitted. After reviewing the evidence and arguments of counsel, the court enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Pester Refining Company ("Pester") is the debtor-in-possession. It is a Kansas corporation with its principal place of business in Des Moines, Iowa. It operated a refinery in El Dorado, Kansas. Burke Energy Corporation ("Burke") was a supplier of certain natural gas products used in Pester's refinery. MAPCO Gas Products, Inc. ("MAPCO") was also a supplier of products used in Pester's refinery. Mid-America Pipeline Company ("Mid-America") operated a pipeline serving Pester, Burke, MAPCO, and others.

Mid-America operated the pipeline system in conjunction with MAPCO Intrastate [1] and MAPCO Underground Storage Company. All three are wholly owned subsidiaries of MAPCO Transportation. Both MAPCO Transportation and MAPCO Gas Products are wholly owned subsidiaries of MAPCO, Inc. The offices of MAPCO and Mid-America are located in the same building in Tulsa, Oklahoma.

Continental Illinois National Bank and Trust Co. of Chicago, First Interstate Bank of Denver, N.A., and Bankers Trust Co. (collectively the "Bank Group") loaned money to Pester in return for a lien on Pester's inventory and other assets. The Bank Group has intervened to protect its secured creditor rights. Inland Crude Purchasing Corporation, Southern Union Refining Company, and the Official Unsecured Creditors Committee of Pester Refining Company have intervened to protect rights which they acquired through Pester's confirmed plan of reorganization.

There are three kinds of natural gas liquid at issue: normal butane, isobutane, and natural gasoline. These products are extracted from natural gas and stored under pressure in liquid form. They were used by Pester in its refining process.

All three products are commonly shipped by pipeline. Because the products are fungible, it is impossible to identify the source of the product after it is put in the pipeline and commingled with other products of the same kind.

The product in question was shipped through the Mid-America pipeline system. That system has underground pipe in several states in the western and central parts of the United States. It is considered a common carrier, is regulated by government agencies, and publishes tariffs specifying the rights and duties of its customers. The system serves both producers and users of liquid natural gas product. Product is put into the pipeline directly from processing plants. It moves through the pipeline and reaches one or more stations. At a station, different kinds and amounts of product can be prepared for further delivery through the pipeline.

Producers who sell their product to users frequently designate a particular station as the location where transfer of title to the product occurs. After the product has reached the station and transfer of title has occurred, the buyer has the responsibility of having the product shipped to an end point of the pipeline system.

Title of the product in this matter was transferred at the Conway, Kansas station. The Conway station is a major station in the Mid-America pipeline system, and is

---

1. MAPCO Intrastate is a separate corporation responsible for operating pipeline in Kansas. It publishes its own tariffs. Nevertheless, its business is taken care of by Mid-America employees.

For purposes of this matter, the parties have elected to treat Mid-America and MAPCO Intrastate as a single entity.

designated as Group 140. Group 140 consists of interconnected pipes and caverns in a geographical area that is approximately 17 miles by 15 miles.

The tariffs and other evidence show that customers could store [2] product at Group 140. There were two types of storage. One type was in-line storage. Mid-America provided this storage in its pipeline. Approximately 3% of Mid-America revenue came from in-line storage charges. Storage space in-line is limited, however, so the tariffs contain economic incentives for using the second type of storage when product is to be stored for a long period of time.

The second type of storage available was storage in underground caverns. Owners of product would have to make separate agreements with MAPCO Underground Storage to use the caverns. None of the product at issue here was stored in the caverns. These two types of storage are storage at the option of the pipeline customer. They are distinct from the incidental storage necessary for Mid-America to operate the pipeline.

Title to the product passed when the product was made available to Pester. Several steps were necessary to make the product available. First, MAPCO or Burke would ship product to Conway and pay the shipment charges. Second, Pester and the seller would execute a product transfer order ("PTO") directing Mid-America to "transfer title" of a specified amount of product from the seller to Pester. The PTO forms provided that the transfer be "F.O.B. Group 140." Third, the PTO would be sent to Mid-America. Fourth, Mid-America would check its records to see if the seller had that amount of product available at Conway. Fifth, if the seller had sufficient product available, Mid-America would transfer that product from the seller's account to Pester's account. Sixth, and finally, Mid-America would send MA–32 forms to Pester and the seller to acknowledge the transfer. No product was moved to effect a product transfer, and no transportation costs were incurred. Mid-America simply charged a flat $10 fee to process each PTO.

The tariffs indicate that once a PTO transaction was completed, future treatment of the product was at Pester's discretion. Pester could elect to ship the product to its refinery. Pester could transfer the product to another pipeline customer, or pick up the product at Conway with trucks. Finally, Pester could store the product in-line. Nothing in the tariffs indicate that Mid-America recognized any rights of the seller to product after a PTO had been processed.

Mid-America automatically placed product transferred by a PTO into Pester's 350 account. The 350 account is also known as a transfer storage account. While product was in the account, it could be transferred to another pipeline customer through a PTO. To have product in the transfer storage account shipped to the refinery, Pester would first have to have Mid-America place the product in what is known as the transportation account. This was accomplished through use of a movement order. However, no actual movement of product was involved in this step. It was simply an accounting transaction that Mid-America required for logistical purposes. After the product was in the transportation account, Pester would then have to designate the product for actual shipment. Product is designated for shipment through use of an MA–10 form. The tariffs give Mid-America the right to require submission of MA–10 forms three weeks before the desired date of delivery.

The tariffs state that product in the transportation account must be designated for shipment within thirty days. However,

---

2. Storage in the pipeline system does not involve any segregation of specific molecules of product for a specific customer. The pipeline cannot operate that way. Product must be constantly flowing for the pipeline to operate properly. Thus, when product is stored in the pipe-line, all that happens is that a certain quantity of fungible product is kept available for a customer. The individual molecules are constantly changing, but a set quantity of the product is maintained.

product that was not designated for shipment could be transferred back to Pester's transfer storage account. Mid-America did not consider product to be in the process of being shipped until it was in the transportation account and designated for shipment. Once the product was designated for shipment, Pester could not exercise any other options regarding that product.

Pester could store product in-line without taking any action. No forms had to be submitted to Mid-America to request storage. Product placed in the transfer storage account by a PTO transaction was immediately subject to storage charges. These charges initially took the form of nonmonetary credits against certain demand storage rights Pester had purchased through previous shipments. When the demand storage rights were used up or otherwise exceeded, Mid-America could lease further storage, or demand removal of the product and assess demurrage charges. Product could also be stored in the transportation account. Mid-America could charge demurrage on product stored in the transportation account if certain requirements were not met.

Although Mid-America and Pester did not always strictly adhere to the tariffs in their course of dealing, the evidence shows that product made available to Pester through a PTO was in fact used at Pester's discretion. At various times Pester shipped product through the pipeline to its refinery, picked up product at Conway with its own trucks, transferred product to other pipeline customers, and stored product in the pipeline.

There was no indication by Mid-America, until after Pester filed for bankruptcy, that Mid-America recognized any seller's rights to product in Pester's accounts.

The working relationship between Pester and Mid-America was one of accommodation. Mid-America would waive the three week notice required for designating product for shipment so that Pester could obtain product in as little as 48 hours after designation. Under that procedure the MA–10 forms became meaningless. The

forms were disregarded, and MA–10 orders were given orally.

In the months before bankruptcy when Pester's refinery operation was going smoothly, Pester would want all of the product in its account at Mid-America scheduled for delivery. Because of this, Mid-America began to automatically transfer Pester's product from the transfer storage account to the transportation account. Most of Pester's inventory would then be delivered to the refinery within a week. In January and February of 1985, however, the refinery operation began to have problems. Pester's inventory in the transportation account began to build up. Nevertheless, Mid-America kept up its practice of automatically transferring product from the transfer storage account to the transportation account.

Exhibits 82–84 summarize activity in Pester's various product accounts from November 1984 through February 1985. These exhibits show that a significant buildup of inventory occurred in Pester's normal butane and isobutane accounts. On January 1, 1985, Pester had 30,654 barrels of normal butane in its transportation account. By February 1, 1985, that inventory had increased to 54,217 barrels, an amount more than sufficient to cover the 18,015 barrels actually delivered to Pester during the month of February.

On January 1, 1985, Pester had 35,340 barrels of isobutane in its transportation account. By February 1, 1985, that inventory had increased to 47,136 barrels. That amount far exceeded the 26,711 barrels actually delivered to Pester's refinery during the month of February.

These figures show that Mid-America was clearly storing significant amounts of normal butane and isobutane for Pester during the month of February.

There was no significant buildup of Pester's natural gasoline inventory during the month of January 1985. During February, however, the inventory on hand, when added to the February purchases of natural gasoline, exceeded the amount delivered to

the refinery that month. Thus, there was some storage of natural gasoline in February.

The PTO transfers from MAPCO under consideration in this matter occurred on February 13, 1985. On that date Mid-America processed PTO's transferring 10,000 barrels of normal butane, 5,000 barrels of isobutane, and 38,000 barrels of natural gasoline from MAPCO to Pester. Mid-America sent an acknowledgment of these transactions—via MA–32 forms—to Pester no later than February 15.

The transactions involving product from Burke occurred on several different dates. On January 24, 1985, Mid-America processed a PTO for 5,000 barrels of isobutane. Mid-America sent an acknowledgment of the transaction to Pester no later than January 25. On February 13, 1985, Mid-America processed a PTO for 5,000 barrels of isobutane. Acknowledgment of that transaction was sent to Pester no later than February 14. Another PTO transfer of 5,000 barrels of isobutane was processed by Mid-America on February 14. Mid-America acknowledged that transaction no later than February 15.

Mid-America processed PTO's for 7,400 barrels of natural gasoline and 2,600 barrels of natural gasoline on February 17 and February 21 respectively. Acknowledgments were sent to Pester no later than February 18 and February 22.

When MAPCO and Burke sent the PTO's for the above transactions to Mid-America, they fulfilled their duties under the contracts for sale of the product to Pester. Pester, however, did not pay MAPCO or Burke for any of the product transferred on the dates just listed.

The Bank Group held a security interest in Pester's inventory of natural gas liquids product. The security interest was given to secure a revolving line of credit. The daily limit of the credit line fluctuated, and was based in part, upon the size of Pester's natural gas liquids inventory. Financing statements for the security interest were filed with the Secretary of State in Kansas and Iowa.

On February 25, 1985, Pester filed a voluntary Chapter 11 petition in bankruptcy. Pester was insolvent when it filed its petition. Representatives of MAPCO, Burke and Mid-America learned of the bankruptcy filing that same day.

On February 25, MAPCO had Mid-America transfer 10,000 barrels of normal butane, 5,000 barrels of isobutane, and 38,000 barrels of natural gasoline from Pester's accounts to MAPCO's accounts. Two days after the fact, MAPCO drafted a letter that explained the transfers. The letter formally notified Mid-America of MAPCO's demand to stop delivery of product in transit. The letter cited Section 2–705 of the Uniform Commercial Code as support for its demand. On the same day Mid-America sent a letter to Pester stating that Mid-America was honoring MAPCO's demand.

On February 25, Burke sent Pester a letter demanding reclamation of 10,000 barrels of isobutane and 10,000 barrels of natural gasoline. The demand for reclamation was based upon Uniform Commercial Code § 2–702.

On March 1, 1985, Mid-America sent Pester another letter. The letter stated that Mid-America had decided to exercise common carrier lien rights, pursuant to the Uniform Commercial Code and published tariffs, by holding 3,260 barrels of normal butane to satisfy previously accrued and unpaid transportation charges.

On March 4, Burke sent a letter to Mid-America directing the pipeline to stop shipment of product in transit to Pester, and to deliver the product to Burke. Burke cited Uniform Commercial Code § 2–705 as authority for its demand. On March 5, Mid-America sent a reply letter to Burke. Mid-America refused to transfer the product unless Burke provided an indemnification agreement backed by a letter of credit. Nevertheless, Mid-America exercised control over the product by deciding to hold it until Burke made the requested arrangement.

The market price for product at Conway, Kansas varied from date to date. On Feb-

ruary 25, 1985, the price of normal butane was $.51 per gallon, the price of isobutane was $.5825 per gallon, and the price of natural gasoline was $.585 per gallon. On March 1, 1985, the price of normal butane was $.5325 per gallon. On March 5, 1985, the price of isobutane was $.58 per gallon and the price of natural gasoline was $.58 per gallon. There are 42 gallons per barrel of product.

On March 15, 1985, Pester's counsel sent a letter to MAPCO and Mid-America stating that their actions had violated the automatic stay imposed by 11 U.S.C. § 362. The letter also demanded that MAPCO and Mid-America turn over the product they were holding to Pester. MAPCO and Mid-America refused to turn over Pester's product.

On March 1, 1985, Burke filed an adversary complaint for reclamation of product transferred to Pester. Burke later filed a non-adversary proceeding motion to require Pester to assume or reject the contract for sale of the product held by Mid-America. Pester counterclaimed against Burke, seeking turnover of product purchased from Burke and held by Mid-America.

On June 7, 1985, Pester filed an adversary complaint against MAPCO and Mid-America. The complaint requested turnover of property of the estate, equitable subordination of liens, and damages for tortious conversion.

### CONCLUSIONS OF LAW AND ANALYSIS

Three main issues are before the court. The first is whether Pester has a right to have certain natural gas product turned over pursuant to Bankruptcy Code § 542(a). The second is whether MAPCO and Burke have a right to reclaim that product pursuant to Bankruptcy Code § 546(c). The third is whether Pester may recover money damages for the alleged conversion of the product. Each of these issues can be determined only after certain subissues are considered. In addition, the court must rule on Burke's motion to compel the assumption or rejection of an executory contract.

### I. TURNOVER

Section 542(a) is the turnover provision of the Bankruptcy Code. It provides that property of the estate, or the value of such property, shall be delivered to the trustee, unless the property is of inconsequential value or benefit to the estate. 11 U.S.C. § 542(a). Pester, as debtor-in-possession, has the rights of the trustee. 11 U.S.C. § 1107(a). Thus, the product, or its value, must be delivered to Pester if it is property of the estate.

#### A. *Property of the Estate*

Property of the estate is defined in Code § 541. The definition includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). According to legislative history, "[t]he scope of this [definition] is broad." S.Rep. No. 989, 95th Cong. 2d Sess. 82, *reprinted in* 1978 U.S. CODE CONG. & ADMN.NEWS 5787, 5868. It includes "title" to property. *Id.*

Pester had title to the product. Furthermore, the sellers of the product—MAPCO and Burke—had completely performed their duties under the sales contracts and had given Pester access to the product in the pipeline. Absent extraordinary circumstances, the product would be property of the estate under § 541(a)(1).

MAPCO and Burke assert that extraordinary circumstances do exist. They argue that their actions to stop delivery of the product while still in transit prevented the product from becoming property of the estate.

That argument has a solid basis in case law. A seller's right to stop the shipment of goods in transit pursuant to U.C.C. § 2-705 is recognized in bankruptcy. *In re Coast Trading Co., Inc.*, 744 F.2d 686, 693 (9th Cir.1984); *In re National Sugar Refining Co.*, 27 B.R. 565, 571-72 (S.D.N.Y. 1983). *See also Matter of Marin Motor Oil, Inc.*, 740 F.2d 220, 225 (3rd Cir.1984). The effect of a seller stopping the goods in

transit is that the sales contract becomes an executory contract under bankruptcy law. *In re Coast Trading Co., Inc.*, 744 F.2d at 693. As a consequence, the debtor's contract rights are property of the estate, but the goods themselves are not such property. The estate has a right to possess the goods only if the contract is assumed under Bankruptcy Code § 365(b). *In re National Sugar Refining Co.*, 27 B.R. at 574.

Although the argument of MAPCO and Burke has a solid legal basis, Pester contends that it does not apply under the facts of this case. Pester argues that the sellers had no right to stop in transit, and that the goods became and remained property of the estate.

### B. *The Right to Stop Goods in Transit*

A seller's right to stop goods in transit is codified in § 2–705 of the Uniform Commercial Code. That section has been adopted by Iowa, Kansas, and Oklahoma without any changes. *Compare* U.C.C. § 2–705 (1977) *with* Iowa Code § 554.2705 (1985),[3] Kansas Stat.Ann. § 84–2–705 (1968), and Okla.Stat.Ann. tit. 12A, § 2–705 (West 1963).

Section 2–705 contains three paragraphs. Two of the paragraphs are relevant in this matter. Paragraph (1) sets forth the circumstances which trigger a seller's right to stop in transit. It provides in material part:

> (1) The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent. . . .

Paragraph (2) enumerates four different acts that cut off the seller's stoppage right. It provides:

> (2) As against such buyer the seller may stop delivery until
>
> (a) receipt of the goods by the buyer; or
>
> (b) acknowledgment to the buyer by any bailee of the goods except a carri-

er that the bailee holds the goods for the buyer; or

> (c) such acknowledgment to the buyer by a carrier by reshipment or as warehouseman; or
>
> (d) negotiation to the buyer of any negotiable document of title covering the goods.

Pester was, at all relevant times, insolvent under U.C.C. § 1–201(23). The product in question was in the possession of carrier Mid-America. Therefore, MAPCO and Burke had a right to stop delivery under paragraph (1) of § 2–705, subject to any cutoff under paragraph (2) of the same section.

It is clear that subparagraphs (b) and (d) of § 2–705(2) did not operate to cut off the right to stop delivery. Those provisions relate to bailees and goods for which negotiable documents of title have been issued. Mid-America, however, is a carrier, not a simple bailee, and no negotiable documents of title covering the product were issued.

Similarly, subparagraph (a) of § 2–705(2) did not operate to cut off the right to stop delivery. Subparagraph (a) only applies upon "receipt of the goods". "Receipt" of goods means taking physical possession of them. U.C.C. § 2–103(1)(c)(1977). Pester did not have physical possession of natural gas product in a pipeline until it passed through Pester's meter at the refinery in El Dorado. The product at issue was not shipped to El Dorado. Pester, therefore, did not "receive" the goods within the meaning of § 2–705(2)(a). *Cf. Ceres, Inc. v. ACLI Metal & Ore Co.*, 451 F.Supp. 921, 923 (N.D.Ill.1978) (bailee's possession of goods does not satisfy § 2–705(2)(a)).

■ Pester, nonetheless, argues that there has been delivery under § 2–705(2)(a). It cites *Warrior Tombigbee Transportation Co., Inc. v. 5,775.674 Net Tons of Coal*, 570 F.Supp. 1405 (S.D.Ala.1983), as support for the proposition that delivery was completed when Mid-America received

---

**3.** To eliminate sex discrimination in its laws, Iowa has changed the term "warehouseman" to "warehouse operator."

the product at Conway (Group 140). The key to Pester's argument is that the sales contracts with MAPCO and Burke provided that the product be shipped "F.O.B. Group 140." *Warrior Tombigbee* apparently holds that arrival of goods at the F.O.B. location completes delivery and cuts off a seller's § 2–705 rights. 570 F.Supp. at 1413.

This court does not agree with the *Warrior Tombigbee* holding. The four acts enumerated in § 2–705(2) are the exclusive means by which the right to stop goods in transit is terminated. *See Ceres*, 451 F.Supp. at 923 (specific circumstances listed in § 2–705 govern termination of seller's stoppage rights). F.O.B. terms are not mentioned in § 2–705(2). Therefore, F.O.B. terms are not determinative of a seller's stoppage rights. *See Matter of Marin Motor Oil, Inc.*, 740 F.2d at 222, 225; *In re Maloney Enterprises, Inc.*, 37 B.R. 290, 293–95, (Bkrtcy.E.D.Ky.1983). The court in *Warrior Tombigbee* erred by looking to U.C.C. § 2–319 to define "delivery" when § 2–705 is the exclusive section dealing with the seller's right to stop goods in transit. Pester's argument that § 2–705(2)(a) applies in this case must be rejected.

The only remaining provision under which MAPCO's and Burke's rights to stop in transit would be cut off is subparagraph (c) of § 2–705(2). That provision requires an acknowledgment by Mid-America that it held the product as a warehouseman for Pester.

### C. *Acknowledgment by Mid-America*

Pester contends that Mid-America gave an acknowledgment that satisfied paragraph (2)(c) of § 2–705. The acknowledgment allegedly occurred when Mid-America processed PTO forms transferring product from MAPCO and Burke to Pester, and then confirmed the transfer by sending Pester MA32 forms showing the change in inventory.

The sellers and the pipeline respond that no such acknowledgment occurred. Their first argument is that there was no acknowledgment of any kind. They assert that the PTO forms can have no legal effect in this case because Mid-America used the forms solely for accounting purposes, and not to transfer title between its customers.

■ That argument is without merit. The evidence presented clearly shows that Mid-America treated the PTO forms as having an effect upon its customer's right to product. After the PTO forms were processed, Mid-America recognized Pester's right to have the product shipped through the pipeline to its refinery, Pester's right to pick up the product at Conway with trucks, and Pester's right to transfer the product to another entity. Further, after the PTO forms were processed, Pester became liable for storage charges, in the form of credits against Pester's earned storage rights. The court must conclude that Mid-America, by processing the PTO forms and confirming with MA32 forms, acknowledged that it held product for the buyer Pester.

Acknowledgment alone, however, is not sufficient to satisfy subsection (2)(c) of § 2–705. The subsection also requires the carrier to acknowledge "as warehouseman". U.C.C. § 2–705(2)(c). The sellers and pipeline assert that the acknowledgment by Mid-America was not "as warehouseman". The argument is, first, that Mid-America is a pure carrier that can never act as a warehouseman, and second, that even if Mid-America could act as a warehouseman, it did not do so with respect to Pester's product.

■ A warehouseman is a person engaged in storing goods for hire. U.C.C. § 7–102(1)(h)(1977). The facts show that Mid-America stored product for its customers in its pipeline at Conway. The storage was in addition to the incidental storage necessary to properly operate the pipeline. Mid-America charged for customer storage; indirectly at first by credits against "demand" storage rights that had been purchased in conjunction with prior shipments, and then, after those rights were exhausted, by direct lease or demurrage charges.

Thus, Mid-America at times provided storage for hire and, in doing so, acted as warehouseman.

■ The remaining issue is whether Mid-America's acknowledgment to Pester pursuant to the PTO forms was, under the circumstances, an acknowledgment *as warehouseman.* The U.C.C. does not specifically define such an acknowledgment. However, pre-Code law and Comment 3 to § 2–705 give some meaning to the phrase. Under pre-Code law it was well established that a carrier would terminate a seller's right to stop goods in transit when the carrier expressly or by implication entered into a new agreement, distinct from the original contract of carriage, to hold the goods for the buyer as his agent, not for the purpose of expediting them to the place of original destination pursuant to that contract, but in a new character, for the purpose of custody on the buyer's account and subject to some new or further order to be given to the carrier. *Coleman v. New York N.H. & H. Ry. Co.,* 215 Mass. 45, 48, 102 N.E. 92, 94 (1913) (citing cases); *Jeffris v. Fitchburg Ry. Co.,* 93 Wisc. 250, 258–59, 67 N.W. 424, 426 (1896) (citing cases); 78 C.J.S. *Sales* § 408(d) (1952); 67 Am.Jur.2d *Sales* § 1059 (1985). *See also In re Nesto,* 270 F. 503, 505 (3rd Cir.1921) (citing Sales Act of Pennsylvania). Such a termination could occur only if the carrier and buyer agreed pursuant to a new contract. *Coleman,* 215 Mass. at 48, 102 N.E. at 94; 78 C.J.S. *Sales* § 408(d). Those principles of law are no different from the law as expressed in Comment 3 to § 2–705 of the U.C.C. That comment states in part:

Acknowledgment by the carrier as a "warehouseman" within the meaning of this Article requires a contract of a truly different character from the original shipment, a contract not in extension of transit but as a warehouseman.

Therefore, the court concludes that those pre-Code principles remain in effect under the Code. *Accord* 67A Am.Jur.2d *Sales* § 1059.

■ Whether or not the buyer and carrier have created a new contract amounting to acknowledgment as warehouseman depends on the relevant circumstances. *See* 78 C.J.S. *Sales* § 408(d). The relevant circumstances under the law cited above include the terms of the original shipment contract and the terms of the agreement between the carrier and the buyer. Two other facts to consider are whether the goods arrived at the destination specified in the original shipment contract, and whether the goods are subject to unpaid freight charges. 78 C.J.S. *Sales* § 408(d); 67A Am.Jur.2d *Sales* §§ 1058–59.

The original shipment contracts in the transactions here were between either MAPCO or Burke and Mid-America. Those contracts required Mid-America to transport product to Conway, with the shippers to pay the freight charges. At the time the PTO forms were processed by Mid-America, the product had reached its destination. There were no freight charges to be paid before Pester could assert control over the goods. These circumstances, although not determinative in and of themselves, do tend to show that Mid-America was holding the product for Pester as a warehouseman.

■ The basic agreement between Mid-America and Pester was established by Mid-America's tariffs and trade practices. Under the agreements, the processing of a PTO form by Mid-America gave Pester certain rights. Pester could request delivery of the product through the pipeline, could pick up the product at Conway with its trucks, or could transfer the rights to the product to another entity. More important, Pester could store the product at Conway as long as it wanted until it decided to exercise one of its other three options. These facts negate any claim that Mid-America regarded Pester as a mere consignee of goods sold by MAPCO or Burke. Rather, they show that Mid-America was holding the goods until further order of Pester, and thus, was acting as warehouseman.

Although several facts indicate that Mid-America had acknowledged as warehouseman, the court believes that the inference

can be defeated if there is evidence showing a specific contract, either existing at the time of Mid-America's acknowledgment or made simultaneously with the acknowledgment, that required Mid-America to ship the product to Pester. Such a contract would supercede the previous agreement between Pester and Mid-America, and would show that the acknowledgment was one as a carrier, not as a warehouseman.

Unfortunately for MAPCO and Burke, the evidence does not establish that such a contract existed. Certainly, there was no written contract for delivery of the product in question. Nor was there a delivery contract which arose pursuant to a specific oral agreement, or pursuant to a tacit agreement established by the past course of dealing with Pester.

It is true that after PTO forms were processed Pester's product would be promptly placed in the transportation account so that it would be available for delivery. Mid-America transferred the product to the transportation account pursuant to a prior oral request by Pester that all product be available for delivery. But an oral request to make product available for delivery does not amount to a contract for delivery.

Placing the product in the transportation account was simply the first step of the delivery process. It was a step that could be reversed. The product could have been placed back in the transfer storage account, and then transferred to another pipeline customer. Mid-America did not recognize a binding shipment contract until Pester delivered an oral or written MA10 order designating product for delivery. The evidence shows that Pester did not explicitly designate all of its product in the transportation account for shipment. Moreover, no evidence shows that Pester designated the product at issue for shipment. Thus, Pester's standing oral request to ready all product for delivery does not establish a contract to ship all of that product.

Mid-America employees testified that under the prior course of dealing with Pester, all inventory in Pester's account would be shipped to Pester's refinery within a week. That testimony does not establish that a contract to ship the product in question existed. First, the evidence showed that on several occasions Pester would send trucks to pick up product at Conway. No shipment was involved in those instances. Thus, it has not been proved that a course of dealing ever existed whereby all the product would be shipped to Pester's refinery. Second, even if such a course of dealing had existed at some time, it was no longer in effect when Pester acquired the product at issue. During the months of January and February 1985, Pester built up a large inventory of product. That buildup negated any prior course of dealing. The evidence does not establish a tacit contract to ship the product.

The most that can be said in favor of the sellers' and pipeline's position is that all the parties involved contemplated that the product would be shipped to the refinery. Mid-America even took some action to facilitate shipment based upon that contemplation. The law is clear, however, that a seller's right to stop goods in transit may be cut off by a carrier, even when the carrier still holds the goods and contemplates shipping them to another destination at some time in the future. *E.g. Coleman,* 215 Mass. at 48, 102 N.E. at 94; 78 C.J.S. *Sales* § 408(b) ("[I]f the goods in the hands of a middleman require new orders to put them again in motion and give them another substantive destination, the original transit is terminated.").

■ Examination of the original shipment contract and the contract between Pester and Mid-America shows Mid-America acknowledged to Pester that it was holding the goods for Pester as warehouseman. That showing was not defeated by a contract to deliver the product. Therefore, the acknowledgment satisfied U.C.C. § 2–705(2)(c), and terminated the rights of MAPCO and Burke to stop shipment of the

product.[4] Because the right to stop shipment had been cut off, the product was property of the estate. It is subject to turnover under Bankruptcy Code § 542(a).

### D. *Common Carrier's Lien*

■ The 3,260 barrels of normal butane held by Mid-America under asserted common carrier liens are also subject to turnover. Mid-America's request to sell the product to collect unpaid transportation charges owed by Pester must be denied.

First, the evidence presented at trial does not establish Mid-America's right to a carrier's lien under U.C.C. § 7–307. There is no evidence that the product being held by Mid-America is covered by a bill of lading, and thus subject to a carrier's lien. U.C.C. § 7–307(1); Iowa Code § 554.7307(1)(1985); Kans.Stat.Ann. § 84–7–307(1)(1968); Okla. Stat.Ann. tit. 12A, § 7–307 (West 1963). Further, a carrier's lien attaches to the goods which incur the charges, and is released when the carrier delivers those goods. U.C.C. § 7–307(3) and Official Comment. Mid-America's unpaid charges arose from delivery of product to Pester's refinery. There can be no carrier's lien for those charges.

■ Second, even if Mid-America has a lien under the U.C.C. or published tariffs, the existence of the lien would not exempt Mid-America from the turnover provisions of 11 U.S.C. § 542. *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 208, 103 S.Ct. 2309, 2315, 76 L.Ed.2d 515, 524 (1983).

## II. RECLAMATION

MAPCO and Burke both assert the right to reclaim the product at issue. Their reclamation rights, if any exist, are based upon § 2–702 of the Uniform Commercial Code, as adopted in Iowa, Kansas, and Oklahoma. Iowa Code § 554.2702 (1985);

Kansas Statutes Ann. § 84–2–702 (1968); Okla.Stat.Ann. tit. 12A, § 2–702 (West 1963). The right to reclamation is recognized by the Bankruptcy Code. 11 U.S.C. § 546(c); *In re Coast Trading Co., Inc.,* 744 F.2d at 689.

Under U.C.C. § 2–702(2) a seller of goods on credit may reclaim those goods when it discovers the buyer received the goods while insolvent. To exercise this right, the seller must make a demand for the goods within ten days after the buyer receives them. U.C.C. § 2–702(2) (1977). The Bankruptcy Code provides the same time limit for making a demand, but adds the further requirement that the demand be in writing. 11 U.S.C. § 546(c)(1).

■ Receipt of the goods, within the meaning of U.C.C. § 2–702, occurred when the sellers' rights to stop the goods in transit were cut off under U.C.C. § 2–705(2)(c). *See Matter of Marin Motor Oil, Inc.,* 740 F.2d at 225–26 and n. 13. On February 13, 1985, MAPCO transferred 38,000 barrels of natural gasoline, 10,000 barrels of normal butane, and 5,000 barrels of isobutane to Pester. MAPCO's rights to stop that product in transit were cut off no later than February 15, when Mid-America sent an MA32 form to Pester acknowledging that the goods were being held for Pester. MAPCO's reclamation demand was made on February 27, well past the ten-day deadline. MAPCO has no reclamation rights.

■ Burke sent its reclamation demand on February 25, 1985. That demand was sent within the ten-day deadline with respect to 10,000 barrels of natural gasoline, which were constructively delivered to Pester under U.C.C. § 2–705 on February 18 and 22. The demand was also timely and effective with respect to the 5,000 barrels of isobutane constructively delivered to

---

**4.** The court's holding is not in any way inconsistent with the holding in *Amoco Pipeline Co. v. Admiral Crude Oil, Corp.,* 490 F.2d 114 (10th Cir.1974). Although MAPCO, Burke, and Mid-America have cited that case as authority supporting their position, it is irrelevant to the matter before the court. *Amoco Pipeline* simply held that the bankruptcy estate did not include oil which had been stopped in transit before the bankruptcy petition was filed. 490 F.2d at 116–17. Any statements in that case which suggest that the debtor could never have constructive possession of oil in the pipeline sufficient to defeat the seller's stoppage rights are pure dicta.

Pester on February 15. It was ineffective with respect to the 5,000 barrels of isobutane constructively delivered February 14.

Burke's right to reclaim the product is subject to the claims of any good faith purchaser of the product. U.C.C. § 2–702(3). The Bank Group claims to be a good faith purchaser by virtue of its financing agreement with Pester. Under that agreement, the Bank Group was given a floating lien on, inter alia, Pester's inventory of natural gas product. The financing agreement and accompanying security agreements were executed before Pester purchased the product in question from Burke.

 The Bank Group's status as a preexisting secured creditor qualifies it as a purchaser. *Matter of Bensar Co.*, 36 B.R. 699, 703 (Bkrtcy.S.D.Ohio 1984); *Swets Motor Sales, Inc. v. Pruisner*, 236 N.W.2d 299, 304 (Iowa 1975). There was no evidence presented that showed the Bank Group acted in bad faith. Thus, the Bank Group is a good faith purchaser whose rights to the product defeat Burke's reclamation rights. U.C.C. § 2–702(3); *In re Coast Trading Co., Inc.*, 744 F.2d at 690–691 (citing *Matter of Samuels & Co., Inc.*, 526 F.2d 1238 (5th Cir.) (en banc), *cert. denied* 429 U.S. 834, 97 S.Ct. 98, 50 L.E.2d 99 (1976)); *Matter of Bensar Co.*, 36 B.R. at 703.

 Burke argues that the Bank Group did not have a *perfected* security interest and, therefore, cannot be a good faith purchaser. That argument is without merit. First, U.C.C. § 1–201(32) does not, by its terms, require a secured creditor to perfect its security interest to become a purchaser. Second, the court holds that the Bank Group's security interest was perfected. A financing statement was filed in Kansas, where the collateral was located. The collateral consisted of an undivided interest in a fungible bulk located in the pipeline's Conway, Kansas area. The fact that the individual molecules of the fungible bulk were constantly changing does not defeat the perfection of the Bank Group's security interest in a share of the product

from that bulk. It is incorrect to argue, as Burke has, that the security interest is unperfected unless the Bank Group has filed a financing statement in every state in which a molecule of product may travel in its journey to Pester's refinery.

MAPCO and Burke have not proved that they are entitled to reclaim product. Their reclamation claims must be dismissed.

## III. MOTION TO ASSUME OR REJECT

Burke's motion to compel the assumption or rejection of an executory contract is closely related to the issues previously discussed. The alleged executory contract is the contract for the sale of the product which Burke tried to stop while in transit.

 An executory contract is one in which performance remains due to some extent on both sides. *Jenson v. Continental Financial Corp.*, 591 F.2d 477, 481 (8th Cir.1979); *Matter of Pester Refining Co.*, 58 B.R. 189, 190–91 (Bkrtcy. S.D.Iowa 1985). Burke completed its performance when it executed PTO forms for the product. Thus, the contract is not "executory" within the meaning of Bankruptcy Code § 365, unless Burke's performance has been suspended by a valid stoppage of the product while in transit. *See In re National Sugar Refining Co.*, 27 B.R. at 574. Because the court has held Burke could not stop the product in transit, there is no executory contract to assume or reject.

## IV. CONVERSION

The parties, at trial, alluded to a drop in the price of natural gas product since MAPCO and Mid-America took control of the product in question. Because of the price drop, an order to turn over the product is not sufficient to place Pester in the position it would have been in if MAPCO and Mid-America had not acted as they did. Pester, therefore, seeks compensatory money damages.

 Money damages for wrongful conduct cannot be recovered in an action for

turnover under Bankruptcy Code § 542. *See Maggio v. Zeitz,* 333 U.S. 56, 62–64, 68 S.Ct. 401, 405, 92 L.Ed. 476, 483–84 (1948); *In re Welded Construction, Inc.,* 339 F.2d 593, 594 (6th Cir.1964) (per curiam); *Matter of Lehan Bros., Inc.,* 29 B.R. 553, 554 (Bkrtcy. M.D.Fla.1983). Thus, Pester seeks to collect money damages by asserting a claim of conversion against MAPCO and Mid-America.

The court faces two legal issues in addition to the merits of the conversion claim: (1) whether the court has jurisdiction over this claim based on state law, and (2) what law to apply in ruling on the merits of the claim. The parties recognized these issues in the pretrial conference order, but have not presented any argument on these issues in their pre-trial or post-trial briefs.

### A. *Jurisdiction*

Under the 1984 amendments to title 28 of the United States Code, district courts have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Such proceedings may be referred to a bankruptcy judge. 28 U.S.C. § 157(a). The question presented in this matter goes to the scope of the bankruptcy court's authority after proceedings have been referred pursuant to § 157(a). If Pester's claim for conversion is a "core proceeding" this court may enter final orders and judgments, subject only to appellate review. 28 U.S.C. §§ 157(b)(1), 158(a) and (c). If the conversion claim is not a core proceeding, but is otherwise related to a case under title 11, and the parties do not consent to final orders being entered, this court can only submit proposed findings of fact and conclusions of law to the district court, which will enter any final order or judgment after de novo review of this court's proposal. 28 U.S.C. § 157(c)(1)and (c)(2). In short, the "jurisdictional" issue in this matter is whether or not Pester's conversion claim is a core proceeding within the meaning of § 157(b).

Core proceedings are not defined in § 157(b). Rather, fifteen different kinds of proceedings are listed as nonexclusive examples of core proceedings. 28 U.S.C. § 157(b)(2)(A)–(2)(O). Thirteen of the listed proceedings are fairly specific. *See* 28 U.S.C. § 157(b)(2)(B)–(2)(N). However, the proceedings listed in subsections (b)(2)(A) and (b)(2)(O) are open-ended.

The only specific core proceeding that could encompass a conversion claim is subsection (b)(2)(C). It provides:

> (2) Core proceedings include, but are not limited to—
>
> ....
>
> (c) counterclaims by the estate against persons filing claims against the estate;

28 U.S.C. § 157(b)(2)(C). This subsection is not applicable because MAPCO and Mid-America have not filed claims against the estate.

Of the two open-ended subsections listing core proceedings, subsection (b)(2)(O) may encompass Pester's conversion claim. Under that subsection, core proceedings include:

> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C. § 157(b)(2)(O). A conversion of estate property is, in a sense, a liquidation of that property. Further, in determining whether money damages should be awarded, the court would be adjusting the debtor-creditor relationship. The state-law nature of the claim does not, by itself, defeat the claim's status as a core proceeding. 28 U.S.C. § 157(b)(3). Thus, under a broad interpretation of the terms of subsection (2)(O), a claim for conversion is a core proceeding.

It is fundamental, however, that neither subsection (2)(O), nor the other subsections setting forth core proceedings, should be construed so broadly that a bankruptcy judge assumes jurisdiction of the kind found unconstitutional by the United States

Supreme Court in the *Marathon* [5] case. *See, e.g., In re Castlerock Properties,* 781 F.2d 159, 162 (9th Cir.1986); *In re Illinois-California Express Inc.,* 50 B.R. 232, 236 (Bkrtcy. D.Colo.1985).

There was no majority opinion in the *Marathon* decision. Instead, a plurality of four justices were joined by two concurring justices. The reasoning used by the concurring justices differed significantly from the plurality's reasoning. As a consequence, lower courts do not have any clear and distinct guideline to follow when confronted by similar jurisdictional issues. Nevertheless, the plurality and concurring opinions can be synthesized to provide general guidance. This was done in *In re Illinois-California Express Inc.,* 50 B.R. 232. In that case, the court discussed the *Marathon* decision as follows:

At issue in *Marathon* were the classic state causes of action, breach of contract and warranty, misrepresentation, coercion and duress. The defendant, Marathon Pipe Line Co., did not file a proof of claim in the case. A plurality of the Supreme Court held that Congress' broad grant of jurisdiction to the bankruptcy courts was unconstitutional because it allowed Article I courts to hear controversies required by the constitution to be heard by Article III courts.

Indeed, the case before us, which centers upon appellant Northern's claim for damages for breach of contract and misrepresentation, involves a right created by state law, a right independent of and antecedent to the reorganization petition that conferred jurisdiction upon the bankruptcy court. Accordingly, Congress' authority to control the manner in which that right is adjudicated, through assignment of historically judicial functions to a non-Art. III 'adjunct' plainly must be deemed at a *minimum.*

*Marathon,* 458 U.S. at 84, 102 S.Ct. at 2878 (emphasis added) (footnote deleted).

Justices Rehnquist and O'Connor concurred with the result to form a majority of six who held that the bankruptcy courts have no jurisdiction over state law contract disputes. They noted separately,

From the record before us, the lawsuit in which Marathon was named defendant seeks damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminister [sic] in 1789. There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of Northern arise entirely under state law. No method of adjudication is hinted, other than the traditional common law mode of judge and jury. The lawsuit is before the Bankruptcy Court only because the plaintiff has previously filed a petition for reorganization in that Court.

*Marathon,* 458 U.S. at 90, 102 S.Ct. at 2881.

Thus, *Marathon* provided a clear mandate that the jurisdiction of the bankruptcy courts to determine state law causes of action should be regarded with much circumspection lest constitutional principles be offended.

50 B.R. at 237–38.

With that admonition in mind, this court concludes that § 157(b)(2)(O) should not ordinarily be construed so broadly that it encompasses a state law conversion claim as a core proceeding. However, the court does not believe that this general rule should apply to the conversion claim here. Two facts lead to the conclusion that this conversion claim can be considered a core proceeding without violating the principles of the *Marathon* decision. Those facts are: (1) the alleged conversion occurred after the bankruptcy petition had been filed, and (2) the rights being asserted by

**5.** *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

the alleged wrongdoers were based upon a pre-petition debt owed by a debtor in bankruptcy.

Because the conversion allegedly took place after the bankruptcy petition was filed, the estate, in trying to protect its property, is not exercising any rights that arose, "independent of and antecedent to the reorganization petition that conferred jurisdiction on the bankruptcy court." *Marathon,* 458 U.S. at 84, 102 S.Ct. at 2878, 73 L.Ed.2d at 623–24 (plurality opinion). Further, to the extent that rights to the converted property are determined, federal rules of decision and federal jurisdiction are involved. *See* 11 U.S.C. § 541 (defining property of the estate); 28 U.S.C. § 1334(d) (giving exclusive jurisdiction over property of the estate to the federal district court). This meets the objections of the concurring justices in *Marathon.* 458 U.S. at 90, 102 S.Ct. at 2881, 73 L.Ed.2d at 627.

■ Because the alleged wrongdoers were trying to satisfy a pre-petition debt, it cannot be said that this conversion claim involves nothing more than state law. It is indisputable that once a debtor files a bankruptcy petition, a creditor can satisfy a pre-petition debt owed to him only in the manner provided by federal bankruptcy law. U.S. CONST. art. I, § 8, cl. 4; *International Shoe Co. v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 110, 73 L.Ed. 318, 320–21 (1929); *First National Bank v. Robinson,* 107 F.2d 50, 53–54 (10th Cir.1939). It cannot be contended that such a creditor can avoid federal jurisdiction over his claim simply by converting property of the estate. Therefore, the court holds that a conversion claim may constitutionally be a core proceeding if the claim is brought by the estate against a pre-petition creditor who converted property of the estate after the bankruptcy petition had been filed.

The court finds further support for its conclusion that the conversion claim at issue here is a core proceeding when the whole situation is viewed from a slightly different perspective. Pester is bringing this conversion claim so that it can be compensated for harm that occurred when MAPCO and Mid-America violated the automatic stay. Congress has made some provision for compensation in similar circumstances by enacting Code § 362(h).[6] 11 U.S.C. § 362(h). Proceedings under § 362(h) are core proceedings. *In re Depew,* 51 B.R. 1010, 1014 (Bkrtcy. E.D.Tenn. 1985). *See also Better Homes of Virginia, Inc. v. Budget Service Co.,* 52 B.R. 426 (E.D.Va.1985). Because Pester's conversion claim is so similar to a core proceeding under Code § 362(h), the conversion claim should also be considered a core proceeding. The court, therefore, holds that Pester's conversion claim is a core proceeding, and that the court may enter a final order and judgment on that claim.

### B. *Choice of Law*

Because the elements of conversion are a matter of state law, the court must choose which state's law should apply in this matter. Bankruptcy courts deciding state law claims have followed the rule announced in *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that the federal court should apply the choice of law rules of the forum state. *E.g., In re B & L Oil Co.,* 46 B.R. 731, 738 (D.Colo.1985); *In re PCH Associates,* 55 B.R. 273, 279 (Bkrtcy. S.D. N.Y.1985). The forum state is Iowa. Under Iowa's choice of law rules, foreign law is presumed to be the same as Iowa law, unless the foreign law is pled and proven. *Matter of Estate of Allen,* 239 N.W.2d 163, 169 (Iowa 1976). No foreign law has been pled or proven regarding the conversion claim. Hence, Iowa law applies.

---

**6.** Pester has not invoked § 362(h) at any time in these proceedings. This may be because the terms of the provision make it applicable only to individuals. *But see Better Homes of Virginia, Inc. v. Budget Service Co.,* 52 B.R. 426, 431

(E.D.Va.1985) (issue not addressed, but corporation allowed recovery under § 362(h)); *In re Tel–A–Communications Consultants, Inc.,* 50 B.R. 250, 254 (Bkrtcy. D.Conn.1985) (holding § 362(h) relief is not limited to individuals).

## C. *Application of Iowa Law*

■ In Iowa, conversion is the act of wrongful control or dominion over chattels in derogation of another's possessory right thereto. *Welke v. City of Davenport*, 309 N.W.2d 450, 451 (Iowa 1981). Good faith is not a defense to the action. *See Larsen v. Housh*, 259 Iowa 911, 919–20, 146 N.W.2d 314, 319 (1966) (citing *Farmer, Thompson & Helsell v. Bank of Graettinger*, 130 Iowa 469, 476–77, 107 N.W. 170, 172 (1906)).

In divisions I and II of this opinion the court has held that Pester had the right to possess the product in question, and that MAPCO and Burke had no such right to the product. Therefore, MAPCO acted wrongfully when it took control of the product on February 25, 1985. In doing so, it committed the tort of conversion.

■ Mid-America also committed the tort of conversion on March 1, 1985, when it withheld product to satisfy asserted carrier's liens, and on March 5, 1985, when it held product pursuant to the stop transit order of Burke. Those actions were wrongful because Burke had no in transit stoppage rights or reclamation rights, and because the existence of a carrier's lien does not give a creditor the right to withhold the collateral from the bankruptcy estate. *See United States v. Whiting Pools, Inc.*, 462 U.S. at 208, 103 S.Ct. at 2315, 76 L.Ed.2d at 524 (1983).

The measure of damages in an action for conversion is ordinarily the fair and reasonable market value at the time and place of taking. *F.S. Credit Corp. v. Shear Elevator, Inc.*, 377 N.W.2d 227, 234–35 (Iowa 1985). Generally, interest is allowed form the date of the conversion. *Id.* at 235.

The conversions took place on February 25, March 1, and March 5, 1985. The only evidence of market value presented by Pester was for the dates of February 25 and March 15, 1985. Using that evidence, the court can determine the value of the product converted by MAPCO. However, that evidence does not allow proper determination of the value of the product converted and held by Mid-America.

The deficiency in the evidence is not fatal to Pester's claim for damages. The spot price for natural gas product at Conway, Kansas for any given date can be found by consulting Platt's Oilgram. Under the Federal Rules of Evidence, the court may take judicial notice of the relevant spot prices as reported in Platt's Oilgram. FED.R.EVID. 201(b)(2), (c), and (f).

On February 25, 1985, MAPCO converted 10,000 barrels of normal butane, 5,000 barrels of isobutane, and 38,000 barrels of natural gasoline. On that date the spot price of normal butane was $.51 per gallon. The spot price of isobutane was $.545 per gallon. And the spot price of natural gasoline was $.55 per gallon. The total value of the product converted by MAPCO was $1,281,735. *See* Appendix.

On March 1, 1985, Mid-America converted 3,260 barrels of normal butane. The spot price for normal butane on that date was $.5325 per gallon. The value of the product converted by Mid-America on that date was $72,909. *See* Appendix.

On March 5, 1985, Mid-America converted 15,000 barrels of isobutane and 2,600 barrels of natural gasoline. The spot price of isobutane on that date was $.58 per gallon. The spot price of natural gasoline was $.58 per gallon. The value of the product converted on that date was $428,-736. *See* Appendix.

■ Pre-judgment interest will be awarded on these values. The rate of interest to be applied is the legal rate. *F.S. Credit Corp.*, 377 N.W.2d at 235. The federal judgment interest rate was 9.17% from February 25 through March 5, 1985.

Pester has requested that punitive damages be awarded. Punitive damages may be awarded for conversion if the conversion is characterized by malice or willful disregard of the plaintiff's rights. *Sandhorst v. Mauk's Transfer, Inc.*, 252 N.W.2d 393, 399 (Iowa 1977).

MAPCO did not act with malice or willful disregard of Pester's rights. MAPCO tried to stop the product in transit with a good faith belief that it was entitled to do so. Although the court has decided that MAPCO was not entitled to stop the goods, MAPCO's belief was not unreasonable under the circumstances. Nor did the fact that bankruptcy had been filed and an automatic stay imposed make MAPCO's actions unreasonable. The automatic stay does not affect a seller's right to stop goods in transit. *In re National Sugar Refining Co.*, 27 B.R. at 572–73. Because MAPCO acted reasonably and in good faith, punitive damages should not be assessed against it.

The same reasoning applies to Mid-America regarding the product it held subject to Burke's stop transit order. A different result, however, is called for with respect to the product Mid-America retained to satisfy past transportation charges. Even if Mid-America has a valid lien upon the product retained, the product was property of the estate subject to turnover, *Whiting Pools*, 462 U.S. at 208–09, 103 S.Ct. at 2315, 76 L.Ed.2d at 524, and was protected by the automatic stay. 11 U.S.C. § 362(a). Mid-America was represented by general counsel and was aware that bankruptcy had been filed. Its actions were clearly in willful disregard of the rights of the bankruptcy estate. Punitive damages should be assessed.

The amount of punitive damages must generally be proportionate to the amount of actual damages. *Pringle Tax Service v. Knoblauch*, 282 N.W.2d 151, 154 (Iowa 1979). In addition, the amount awarded turns "more or less" on the facts peculiar to the case. *McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362, 368 (Iowa 1972). Under the facts of this matter, the court will assess punitive damages in the amount of $36,500.

## V. RELIEF ORDERED

Pester has prevailed on its request for turnover and on its claim for money damages. Since the time Pester filed its complaint, however, the refinery which uses the product has been sold. Pester no longer has any use for the product. Moreover, an order of relief combining turnover of product with an award of damages would create problems in determining the amount of damages to award. Because money damages can fully compensate Pester, the order of relief will be limited to such damages.

An appropriate order will be entered.

## APPENDIX

**Value of Product Transferred to MAPCO**

| | |
|---|---|
| 10,000 barrels normal butane × $0.5375/gal. × 42 gal./barrel | $ 225,750 |
| 5,000 barrels isobutane × $0.5825/gal. × 42 gal./barrel | 122,325 |
| 38,000 barrels natural gasoline × $0.585/gal. × 42 gal./barrel | 933,660 |
| Total | $1,281,735 |

**Value of Product Held for Burke by Mid-America**

| | |
|---|---|
| 15,000 barrels isobutane × $0.58/gal. × 42 gal./barrel | $ 365,400 |
| 2,600 barrels natural gasoline × $0.58/gal. × 42 gal./barrel | 63,336 |
| Total | $ 428,736 |

**Value of Product Held by Mid-America Under Asserted Carrier's Lien:**

| | |
|---|---|
| 3,260 barrels normal butane × $0.5325/gal. × 42 gal./barrel | $ 72,909 |
| Total | $ 72,909 |