JEFFRIS, Respondent, vs. FITCHBURG RAILROAD COMPANY, Appellant.

*April 16 — May 1, 1896.*

Sale of chattels: Stoppage in transitu: Insolvency of consignee: Evidence: When transit terminates: Partial delivery: Order for delivery.

1. The question being as to the right of stoppage *in transitu* of lumber sold and consigned to a lumber company, evidence that such company had failed to pay just and undisputed debts for over ten

Jeffris vs. Fitchburg R. Co.

months, and that upon inquiry no such concern was to be found at or about the alleged place of its business, and it was not named in the city directory,— is *held* sufficient, in the absence of any attempt to dispute or rebut it, to sustain a finding that the company was insolvent.

2. The *transitus* of goods is not at an end, so as to prevent a stoppage *in transitu*, unless there has been something equivalent to an attornment on the part of the carrier to the consignee, so that he holds them for the consignee, not as carrier, but as agent.

3. A custom by which consignees of lumber were permitted to leave it in the warehouse of the carrier, to be taken away at their convenience upon payment of the charges, did not give the consignees any new rights or render the carrier's possession of lumber so left in its warehouse the possession of the consignee.

4. Delivery of a part of a consignment will not, unless shown to have been so intended, operate as a constructive delivery of the remainder, so as to prevent a stoppage *in transitu.*

5. An order by the consignee upon the carrier for the delivery of the goods to a third person upon payment of the charges, though left with the carrier, gives such third person only the rights which the consignee had and cannot, of itself, prevent a stoppage *in transitu.*

Appeal from a judgment of the circuit court for Rock. county: John R. Bennett, Circuit Judge. *Affirmed.*

This was an action for the conversion of 18,679 feet of lumber sold and consigned by the plaintiff to the J. B. Dixon Lumber Company, of Boston, in December, 1890, and which arrived in Boston over the road of the defendant company, and was placed in its warehouse for delivery to the consignee. It further appeared at the trial before the court that the bill for the lumber became due February 15, 1891, but the lumber had never been paid for; that a bill had been sent for collection in the spring of 1891. M. G. Jeffris testified to finding the lumber in one of the sheds of the defendant company, December 21, 1891, and to a conversation with one Simons, the freight agent of the defendant, who said that the lumber was there and that it had not been delivered because the freight had not been paid; that he then informed the freight agent that the J. B. Dixon Lumber Company had never paid for the lumber, and that he repre-

sented the plaintiff, and desired to stop the lumber then and there in transit, and to take it; that he told him that he had looked in the Boston directory, and had gone where the said company was supposed to be, but could find no such concern in Boston (as he testified was the fact); that he was informed that the charges on the lumber were for freight $124.98, storage $97.50, and he offered to pay the charges and take the lumber; that he said he could not take it, and could not let him have the lumber, on the ground that the defendant did not know whom it belonged to, and he would have to bring an action of replevin and let the court decide; that he told Simons that there was no such concern as the J. B. Dixon Lumber Company, that he had been over to where they did business, and the only man there told him that there was no such concern, but that it was J. B. Dixon (as he testified was the fact), and asked, if he got an order from said Dixon, if he would deliver the lumber, to which he replied, " No," that he would have to have an order from the J. B. Dixon Lumber Company; but he finally said such an order would not do; that the plaintiff would have to bring an action of replevin.

On behalf of the defendant it was shown by one Cooper that he was formerly connected with the J. B. Dixon Lumber Company during its continuance in business, up to February, 1891; that the car of lumber in question arrived at Boston in due course, and they were advised of it. The lumber was removed from the car and, not being taken away at the proper time, it was stored in the old shed of the company in its upper loft. About one fourth of the lumber was taken away and sold to the New Bedford Casket Company in November, 1890. J. B. Dixon was the president of the Dixon Lumber Company. The witness identified, as in his handwriting, an order produced by the defendant's counsel, and offered in evidence, as follows: " Boston, March 9, 1891. *Fitchburg R. R.:* Please deliver to F. C. Bill the pine lumber from car 1863 on payment of

freight and charges.  J. B. Dixon Lumber Company." He testified: "It was the custom and understanding between the J. B. Dixon Lumber Company and the *Fitchburg Railroad Company* that any lumber that arrived over the Fitchburg Railroad was stored by the railroad company at the risk of the lumber company, and that the lumber company had a right to and did remove it whenever it was convenient so to do, *subject to the payment of the charges* of the railroad company.  All such lumber was placed subject to the order and control of the J. B. Dixon Lumber Company *on the payment of the charges* of the railroad company." One Crowell testified that he surveyed the lumber in question at the request of Simons, the local freight agent of the defendant, in April, 1892; that it was in the old shed, door 4. When he surveyed it he removed it to the bay underneath, and it amounted to 13,280 feet; and it was shown that it had remained there ever since.  Simons, the local freight agent of the defendant, testified that he knew of the car of lumber, and to the amount of charges on the lumber.  He was asked: What has been the custom of the *Fitchburg Railroad Company* and the J. B. Dixon Lumber Company, or the understanding between them, in regard to the leaving of said lumber in the sheds and yards of said company in Boston?  *Answer.*  It may be left in sheds at their expense and risk, to be taken away by them at any time, *upon payment of freight and charges.*  This has been the custom of all the railroads terminating in Boston for many years. William Clancey, manager and proprietor of the Lumber Mercantile Association in Chicago, testified to making a demand of payment by letter in December, 1891, of the plaintiff's bill for the lumber.  The claim was not paid, but returned by said company to the plaintiff.

The court found that the lumber in question, 13,280 feet, had never been delivered to the J. B. Dixon Lumber Company, and that said company became and was insolvent De-

cember 21, 1891; that it never paid for such lumber; that
the plaintiff on the day last mentioned claimed the right to
stop said lumber by reason of the failure of said company
to pay for the same, and demanded it of the defendant, offer-
ing to pay its charges thereon; that the defendant refused
to deliver it, and converted it to its own use; that the value
of the lumber was $305.14, and the amount of defendant's
charges for freight and storage was $222.28, and that the
plaintiff was entitled to stop said lumber, and to possession
of the same, on payment of such charges, of which tender
had been made December 21, 1891. Judgment was given in
favor of the plaintiff against the defendant for $83.16, the
difference between the value of said lumber and said charges,
with interest from December 21, 1891, with costs, from which
the defendant appealed.

For the appellant there was a brief by *Jackson & Jackson*,
and oral argument by *A. A. Jackson*. They contended, *inter
alia*, that where the consignee is in the habit of using the
warehouse of the carrier as his own, the transit is at an end
when the goods have reached the place of destination and
have been placed in the warehouse of the carrier. *Richard-
son v. Goss*, 3 Bos. & P. 126, 127; *Scott v. Pettit*, id. 469, 472;
*Dixon v. Baldwen*, 5 East, 175; *Foster v. Frampton*, 6 Barn.
& C. 107; *Tucker v. Humphrey*, 4 Bing. 516; *Rowe v. Pick-
ford*, 8 Taunt. 83; *Allan v. Gripper*, 2 Cromp. & J. 218; 2
Kent, Comm. 545. " And if the consignee, for his own con-
venience, agree with the carrier to let his goods remain in
the warehouse, to be delivered when or as he should want
them, or if that be the course of dealing between them, the
carrier becomes the warehouseman or agent of the buyer,
although he may still have a lien upon them for freight."
Hutchinson, Carriers (2d ed.), § 417; *Klein v. Fischer*, 30
Mo. App. 568; *Langstaff v. Stix*, 64 Miss. 171; *Hall v. Di-
mond*, 63 N. H. 565; *Reynolds v. B. & M. Railroad*, 43 id.
580, 590; *Mottram v. Heyer*, 1 Denio, 483, 487; *Whitehead*

*v. Anderson,* 9 Mees. & W. 518. The making and delivery to F. C. Bill of an order for the lumber remaining in the railroad sheds by the J. B. Dixon Lumber Company, was a transfer of the title in such lumber to F. C. Bill. The delivery of the order was a symbolical delivery of the lumber and was sufficient to transfer the possession of the lumber to F. C. Bill, subject to the payment of the freight and charges of the railroad company. *Ellis v. Hunt,* 3 Term, 464; *Elmore v. Stone,* 1 Taunt. 458; *Searle v. Keeves,* 2 Esp. 598; *Hollingsworth v. Napier,* 3 Caines, 182; *Rawls v. Deshler,* 3 Keyes, 572; *Carpenter v. Graham,* 42 Mich. 191. The receipt of the order for the lumber and placing it on file by the railroad company without objection was a notice to it of the sale of the lumber and a sufficient recognition and assent to the transfer of the title, and constituted the company the warehouseman and bailee of Bill. *Harmon v. Anderson,* 2 Camp. 243; *Whitehouse v. Frost,* 12 East, 614; *Lucas v. Dorrien,* 7 Taunt. 278, 288; *Barney v. Brown,* 2 Vt. 374; *Spaulding v. Austin,* id. 555, 560; *Pierce v. Chipman,* 8 id. 334, 338; *Hodges v. Hurd,* 47 Ill. 363; *Buhl Iron Works v. Teuton,* 67 Mich. 623, 630, 631; Paton, Stoppage in Transitu, 56; *Nat. Bank v. Buckeye I. & B. Works,* 46 Ill. App. 526; *Freiburg v. Steenbock,* 54 Minn. 509; *Floege v. Wiedner,* 77 Tex. 311; *Farnum v. Pitcher,* 151 Mass. 470. Where the goods have arrived at their destination and are stored in the warehouse of the carrier as the agent of the vendee, the right of stoppage is terminated. *McFetridge v. Piper,* 40 Iowa, 627, 628; *Clapp v. Peck,* 55 id. 270; *Sawyer v. Joslin,* 20 Vt. 172, 180; Benj. Sales (Perkins ed.), § 849.

For the respondent there was a brief by *Fethers, Jeffris & Fifield,* and oral argument by *M. G. Jeffris.*

PINNEY, J. 1. It is insisted that the finding that the J. B. Dixon Lumber Company was insolvent was without any evidence to support it, and that therefore the claim of the

plaintiff to exercise the right of stoppage *in transitu* of the lumber, December 21, 1891, was without any warrant or foundation. The sale of the lumber by the plaintiff to that company occurred in the early autumn of 1890, and the purchase price became due February 15, 1891. This was a just and undisputed debt. Effort to collect it had proved unavailing, and the purchaser had wholly failed to respond to its obligation for a period of over ten months. Investigation then made showed that there was no such concern located at or about the alleged place of its business, and it was not named in the city directory. The person in charge where it had done business stated that there was no such concern, but that it was J. B. Dixon. The witness Cooper, examined by the defendant, testified that J. B. Dixon was the president of the J. B. Dixon Lumber Company, and that he (witness) was connected with the company " during its corporation, so to speak,— not exactly in its literal sense,— during its continuance in business, up to about the first of February, 1891." The just inference is that this company was a corporation, and that it had suspended business February 1, 1891, a few days before the plaintiff's debt matured. Strict proof of insolvency is not required in order to justify the exercise of the right of stoppage *in transitu*. " By the word ' insolvency' is meant a general inability to pay one's debts; and of this inability the failure to pay one just and admitted debt would probably be sufficient evidence." Benj. Sales, § 837; Smith, Merc. Law, 550, and note. It had failed to pay the just and undisputed debts it had owed to the plaintiff and to the defendant for over ten months. Inquiry made at the former place of business of the debtor elicited the information that there was no such concern,— that it was only J. B. Dixon; and the fact that the witness Cooper, connected with it during its corporate existence and having some knowledge of its business, called to show that the right of stoppage had been terminated by delivery

Jeffris vs. Fitchburg R. Co.

to the company or its agent, was not interrogated as to its solvency, is quite suggestive, in view of the facts in evidence, when fairly satisfactory proof of its solvency would have been fatal to the plaintiff's action. The evidence constitutes sufficient *prima facie* proof of insolvency to sustain the finding. There was no attempt made to dispute this evidence or to rebut it. We must hold that the evidence was sufficient to warrant the finding.

2. Had there been a delivery of the lumber, in view of the evidence, to the consignee, or to an agent of the consignee, so that the defendant had no longer any possession or control of it as carrier? The lumber had reached its ultimate destination, and the controversy is really reduced to the question whether the defendant held it as carrier or as the agent and warehouseman of the consignee. It may be properly said that the possession of the lumber by the defendant was ambiguous, and that it is necessary to gather the intention of the parties from their acts and the effect the law imputes to what they have done. It is said that nothing prevents an agreement by the carrier to hold the goods, after arrival at destination, as agent of the buyer, though he may at the same time say, "I shall not let you take them till my freight is paid." The question is one of intention, and in *Whitehead v. Anderson*, 9 Mees. & W. 518, the captain was held not to have intended such an agreement by telling the assignee that he *would* deliver him the cargo when he was satisfied about the freight; PARKE, B., saying: "There is *no proof of such a contract*. A promise by the captain to the agent of the assignee is stated, but it is no more than a promise, without a new consideration, *to fulfill* the *original contract* and deliver in due course to the consignee *on payment of freight*, which leaves the captain in the same situation as before." Benj. Sales, § 853. The existence of the carrier's lien for unpaid freight, it is held, raises a strong presumption that the carrier continues to hold the goods as

carrier and not as warehouseman; and in order to rebut this presumption there must be proof of some arrangement or agreement between the buyer and the carrier whereby the latter, while retaining his lien, becomes the agent of the buyer to keep his goods for him. *Ex parte Barrow*, 6 Ch. Div. 783.

In *Ex parte Cooper*, 11 Ch. Div. 68, it was held that: "Where goods are placed in the possession of a carrier to be carried for the vendor to be delivered to the purchaser, the *transitus* is not at an end so long as the carrier continues to hold the goods as carrier. It is not at an end until the carrier, by agreement between himself and the consignee, undertakes to hold the goods for the consignee, not as carrier, but as his agent." Unless something equivalent to an attornment on the part of the carrier to the consignee is shown, so that he has altered his position and holds the goods in another capacity, the *transitus* is not at an end. No doubt, where the carrier enters into a new contract with the consignee, distinct from the original contract of carriage, to hold the goods for him as his agent in a new character for the purpose of custody on his account, the *transitus* would be at an end and the goods constructively in the possession of the consignee. *McLean v. Breithaupt*, 12 Ont. App. 383, 388, 390. In *Whitehead v. Anderson*, 9 Mees. & W. 518, the court say: "A case of constructive possession is where the carrier enters expressly or by implication into a new agreement, distinct from the original contract for carriage, to hold the goods for the consignee as his agent, not for the purpose of expediting them to the place of original destination pursuant to that contract, but in a new character, for the purpose of custody, on his account, and subject to some new or further order to be given to him;" and JAMES, L. J., shortly puts it in *Ex parte Cooper*, 11 Ch. Div. 68, that " there must be no such change as makes the carrier or warehouseman the holder of the goods as the agent of the vendee."

In *Hoover v. Tibbits*, 13 Wis. 79, this court held that where the warehouseman to whom the goods are directed to be sent receives them as the agent of the carrier, and while he is holding them as such agent for the purpose of collecting freight and charges the vendor asserts his right of stoppage of the goods, they will not be considered as in the possession of the vendee, so as to cut off that right; and in *Harding P. Co. v. Allen*, 65 Wis. 584, the rule laid down in Benj. Sales (2d Am. ed.), 788, is declared to be the rule in this state,— that " if the possessor of the goods has the intention to hold them for the buyer, and not as agent to forward, and the buyer intends the possessor so to hold them for him, the *transitus* is at an end; but I apprehend that both these intents must concur, and neither can the carrier of his own will convert himself into a warehouseman, so as to terminate the *transitus*, without the agreeing mind of the buyer, nor can the buyer change the capacity in which the carrier holds possession without his assent, at least until the carrier has no right whatever to retain possession as against the buyer." In *Sherman v. Rugee*, 55 Wis. 346, 347, the question is broadly put whether there was ever a moment in which the purchasers had dominion and control over the property. Delivery, actual or constructive, by the carrier to the consignee or his agent, is a part of its duty as such, and, until performed, it cannot be said that the carrier has ceased to hold the goods as carrier. The real question is whether, under the evidence, it is a just inference that the carrier has intended to waive his lien for freight, and to surrender dominion and control over the property, or to hold it subordinate to and for the consignee. Unless the evidence justifies such a conclusion, the fair implication of the law is that, if the goods are in the carrier's warehouse awaiting payment of freight and other charges, then the *transitus* has not been ended, but that the carrier holds them in his capacity of carrier, to keep good his common-law lien for freight and charges, and

that they are subject to the vendor's right of stoppage. *Calahan v. Babcock,* 21 Ohio St. 281; *Symns v. Schotten,* 35 Kan. 310.

The evidence fails to establish an agreement or contract which would constructively render the possession of the defendant of the lumber in its warehouse the possession of the consignee. Simons, the freight agent, had no personal knowledge of the transaction. It occurred before his connection with the defendant company. He does not claim to know of any such arrangement between the defendant and the consignee. He testified only to the existence of a custom of the defendant, as he gathered it " from its records and papers in his charge " when he gave his testimony; and he said that such custom had existed with all railroads terminating in Boston for years; but that was merely a custom on the part of the consignees of lumber to leave it in the sheds of the carrier, at their expense and risk, " to be taken away by them at any time, upon payment of freight and charges," and was no more than an understanding or custom on the part of the carrier to deliver on the usual terms and according to the contract with him as carrier. It did not give the consignee any new rights, and did not give him dominion or control over the property. Cooper's testimony is equally inadequate to the purpose intended, and was, in substance, the same. He defined the right of the J. B. Dixon Lumber Company, after the lumber had been stored in the shed of the carrier, in the same way, as " a right to remove it whenever it was convenient to do so, subject to the payment of the charges of the railroad company," — the same right upon which any consignee may obtain his goods of a carrier. Speaking of the fact that after the lumber was stored in the shed part of it was delivered to him for the J. B. Dixon Lumber Company, he said, " Some person connected with the freight department authorized me to take it."

The language of Lord BLACKBURN in *Kemp v. Falk*, 7 App.
Cas. 584, is quite pertinent: "The freight was not paid, but
I think it is possible to make an arrangement by which,
though the freight is not paid, the shipowner changes him-
self completely into a warehouseman, instead of being a car-
rier or shipowner. He alters his responsibilities altogether,
and yet, by arrangement or agreement, retains a lien over
the goods until the freight is paid. I think such a contract
might be made. But when one is asked to say that such a
contract was made, the nonpayment of the freight is a very
important element leading one to say that no such contract
was made at all. In this case I cannot help thinking that
no such contract was made, and there is no reason why we
should hold that it was. The shipowner acted in the same
way as if it had not been made, and in no other way." And
the defendant so acted in the present case, as well as the
consignee, as we have seen. The witnesses do not testify to
any agreement or contract, or even understanding in the
contractual sense, such as is relied upon to work a construct-
ive delivery; and within the principles referred to, upon the
evidence in the record, none can be deduced or implied.

3. The contention that a delivery of a part of the consign-
ment operated as a constructive delivery of the remainder,
cannot be sustained. Whether delivery of a part amounted
to a delivery of the remainder is a question of intention, and
a delivery of a part will not be a delivery of the whole
unless the circumstances show that it was intended so to
operate. It cannot be supposed that the carrier intended to
abandon his lien for the unpaid freight and charges. Benj.
Sales, § 857; *Ex parte Cooper*, 11 Ch. Div. 68; *Buckley v.
Furniss*, 17 Wend. 504; *Crawshay v. Eades*, 1 Barn. & C.
181. Much more clearly would this be so where, as in this
case, it was understood that delivery could be had only on
payment of unpaid freight and charges.

4. The order given March 9, 1891, by the J. B. Dixon

Lumber Company to F. C. Bill upon the defendant to deliver the lumber in question to him "on payment of freight and charges," and left with the defendant, could only operate to give Bill whatever rights the J. B. Dixon Lumber Company had. There is nothing to show that the defendant ever assumed to hold the lumber as his agent, or that it ever recognized any right on his part to have the delivery of it, or that it ever agreed to deliver it to him upon any terms whatever. The evidence shows that the defendant afterwards regarded the J. B. Dixon Lumber Company as entitled to the delivery of the lumber upon the usual terms, as before. There is nothing in the case to show that this order is entitled to any significance in the present controversy. -

The defendant has been fully protected in its rights by the judgment of the circuit court, and no error has intervened to its prejudice.

*By the Court.*— The judgment of the circuit court is affirmed.