**1476**

In the Matter of PESTER REFINING COMPANY, a Kansas Corporation, Debtor (Three Cases).

PESTER REFINING COMPANY, Appellee,

and

The Continental Illinois National Bank and Trust Company of Chicago; First Interstate Bank of Denver, N.A.; and Bankers Trust Company, Intervenors Below,

v.

MAPCO GAS PRODUCTS, INC. and Mid–America Pipeline Company,

Burke Energy Corporation, Appellant,

Unsecured Creditors Committee, Southern Union Refining Co., Inland Crude Purchasing Corp., Appellees.

PESTER REFINING COMPANY, Appellee,

and

The Continental Illinois National Bank and Trust Company of Chicago; First Interstate Bank of Denver, N.A.; and Bankers Trust Company, Intervenors Below,

v.

MAPCO GAS PRODUCTS, INC., Appellant,

and

Mid–America Pipeline Company, and Burke Energy Corporation,

Unsecured Creditors Committee, Southern Union Refining Co., Inland Crude Purchasing Corp., Appellees.

PESTER REFINING COMPANY, Appellee,

and

The Continental Illinois National Bank and Trust Company of Chicago; First Interstate Bank of Denver, N.A.; and Bankers Trust Company, Intervenors Below,

v.

MAPCO GAS PRODUCTS, INC.

and

Mid–America Pipeline Company, Appellant,

and

Burke Energy Corporation,

Unsecured Creditors Committee, Southern Union Refining Co., Inland Crude Purchasing Corp., Appellees.

Nos. 87–1907, 87–1908 and 87–1942.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1987.

Decided April 28, 1988.

Rehearing and Rehearing En Banc Denied July 6, 1988.

Mark Schantz, Des Moines, Iowa, and W. Michael Shinkle, Davenport, Iowa, for appellants.

Mick J. DiGiovanni, Chicago, Ill., for appellees.

Before JOHN R. GIBSON, BOWMAN, and WOLLMAN, Circuit Judges.

WOLLMAN, Circuit Judge.

Pester Refining Company (Pester) filed a Chapter 11 bankruptcy petition on February 25, 1985. In an adversary proceeding, the bankruptcy court held that Mapco Gas Products, Inc. (Mapco) and Mid–America Pipeline Company (Mid–America) had wrongfully converted various natural gas liquids (NGLs) that were property of Pester's bankruptcy estate and subject to the turnover provisions of 11 U.S.C. § 542(a). Mapco, Mid–America, and Burke Energy Corporation (Burke) appeal from the district court's[1] affirmance of the bankruptcy court's[2] judgment. 85 B.R. 520. We

---

1. The Honorable Harold D. Vietor, Chief Judge, United States District Court for the Southern District of Iowa.

2. The Honorable Richard Stageman, United States Bankruptcy Judge for the Southern District of Iowa.

affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I

Pester,[3] the debtor in possession,[4] operated a refinery in El Dorado, Kansas. Mapco and Burke were suppliers of NGLs used in Pester's refinery. The NGLs in question were shipped through Mid–America's pipeline system, a common carrier.

Title to the NGLs passed from Mapco or Burke to Pester when the relevant NGLs were made available to Pester at Mid–America's Conway, Kansas, station (Group 140). The bankruptcy court described the steps necessary to make the product available at Group 140:

First, MAPCO or Burke would ship product to Conway and pay the shipment charges. Second, Pester and the seller would execute a product transfer order ("PTO") directing Mid–America to "transfer title" of a specified amount of product from the seller to Pester. The PTO forms provided that the transfer be "F.O.B. Group 140." Third, the PTO would be sent to Mid–America. Fourth, Mid–America would check its records to see if the seller had that amount of product available at Conway. Fifth, if the seller had sufficient product available, Mid–America would transfer that product from the seller's account to Pester's account. Sixth, and finally, Mid–America would send MA–32 forms to Pester and the seller to acknowledge the transfer. No product was moved to effect a product transfer, and no transportation

costs were incurred. Mid–America simply charged a flat $10 fee to process each PTO.

*In re Pester Ref. Co.*, 66 B.R. 801, 806 (Bankr.S.D.Iowa 1986).

Following a PTO transfer from Mapco or Burke, Mid–America placed the NGLs in Pester's transfer storage account. Two additional steps were theoretically required to ship NGLs to Pester's refinery.[5] First, Pester, by a "Transfer Storage Movement" form, was to instruct Mid–America to transfer the product to its transportation account. Second, by use of an MA–10 form, Pester was to designate the NGLs for actual shipment.

In practice, the bankruptcy court found the working relationship between Pester and Mid–America to be one of accommodation. For years prior to filing its bankruptcy petition, Pester had requested that all NGLs in its accounts at Mid–America be scheduled for delivery. Mid–America thereupon automatically transferred the NGLs from Pester's transfer storage account to its transportation account.[6] In addition, the use of MA–10 forms was disregarded and oral designation orders were accepted so that Pester could obtain NGLs within forty-eight hours after designation.

Most of Pester's inventory was delivered to the refinery within a week of its arrival at Mid–America. In January and February of 1985, however, inventory began to accumulate in Pester's transportation account. For example, the bankruptcy court found that Pester's normal butane inventory in its transportation account increased from 30,654 barrels on January 1, 1985, to 54,217 barrels on February 1, 1985, which greatly

---

**3.** The Continental Illinois Bank and Trust Company of Chicago, First Interstate Bank of Denver, N.A., and Bankers Trust Company intervened to protect their interests as secured creditors. Inland Crude Purchasing Corp., Southern Union Refining Co., and the Unsecured Creditors Committee intervened to protect rights they acquired through Pester's confirmed reorganization plan. The intervenors will be referred to collectively with Pester where appropriate.

**4.** Pester, as debtor in possession, has the rights of the trustee. 11 U.S.C. § 1107(a) (Supp. IV 1986).

**5.** As noted by the bankruptcy court, "[s]torage in the pipeline system does not involve any segregation of specific molecules of product for a specific customer. * * * Thus, when product is stored in the pipeline, all that happens is that a certain quantity of fungible product is kept available for a customer." *Pester,* 66 B.R. at 806 n. 2.

**6.** Pester occasionally instructed Mid–America to retain certain NGLs in its transfer storage account. This would occur, for example, if Pester intended to resell the NGLs rather than use them in its refinery. Such was not the case here.

exceeded the 18,015 barrels actually delivered to Pester during February. *Pester*, 66 B.R. at 807. Similarly, the bankruptcy court found that Pester's isobutane inventory in its transportation account increased from 35,340 barrels on January 1, 1985, to 47,136 barrels on February 1, 1985, which also exceeded the 26,711 barrels actually delivered to Pester's refinery in February. *Id.* Nonetheless, Mid–America continued to automatically transfer NGLs from Pester's transfer storage account to its transportation account.

On February 25, 1985, the day Pester filed its Chapter 11 bankruptcy petition, Mapco orally requested Mid–America to transfer the following NGLs for which Mapco had not been paid from Pester's account to Mapco's account: 10,000 barrels of normal butane, 5,000 barrels of isobutane, and 38,000 barrels of natural gasoline.[7] Two days later, Mapco sent a letter formally notifying Mid–America of its demand to stop delivery of the NGLs in transit pursuant to section 2–705 of the Uniform Commercial Code (U.C.C.). On February 27, 1985, after receiving Mapco's letter and an agreement for indemnification, Mid–America decreased Pester's transportation account and increased Mapco's transportation account by the requested amounts.

On March 1, 1985, Mid–America sent a letter to Pester stating that it had decided to exercise its common carrier lien rights, pursuant to its published tariffs and the U.C.C., by withholding 3,260 barrels of Pester's normal butane to satisfy previously accrued and unpaid transportation charges.

On March 4, Burke sent a letter to Mid–America directing it to stop shipment of 15,000 barrels of isobutane and 10,000 barrels of natural gasoline in transit to Pester. Burke's demand was also pursuant to U.C.C. § 2–705. Mid–America refused to transfer the NGLs to Burke unless provided with an indemnification agreement backed by a letter of credit. Although Burke never provided the indemnification requested, Mid–America withheld 15,000 barrels of isobutane and 2,600 barrels of natural gasoline from Pester. These NGLs were not transferred to Burke's account, however.

On March 15, 1985, Pester's counsel sent a letter to Mapco and Mid–America stating that their actions had violated the automatic stay imposed by 11 U.S.C. § 362 and demanding that they turn the NGLs in question over to Pester. Mapco and Mid–America refused.

The bankruptcy court determined that U.C.C. § 2–705(2)(c) terminated the rights of Mapco and Burke to stop the NGLs in transit. *Pester*, 66 B.R. at 813–14. The bankruptcy court also determined that Mid–America had failed to establish a carrier's lien under U.C.C. § 7–307, and that even if such lien existed, the NGLs were nonetheless subject to the turnover provisions of 11 U.S.C. § 542(a). *Id.* at 814.

## II

One in possession of property of the bankruptcy estate is required to deliver such property to the trustee unless it is of inconsequential value or benefit to the estate. 11 U.S.C. § 542(a) (1982).[8] Property of the estate is broadly defined as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1982). Pester had title to the NGLs in question. Accordingly, absent special circumstances, the NGLs in question were property of the estate and subject to the turnover provisions of section 542(a).

---

**7.** On February 25, 1985, Burke sent a letter to Pester demanding reclamation of 10,000 barrels of isobutane and 10,000 barrels of natural gasoline pursuant to U.C.C. § 2–702. Mapco and Burke have not appealed the bankruptcy court's dismissal of their reclamation claims. *Pester*, 66 B.R. at 814–15.

**8.** 11 U.S.C. § 542(a) states in relevant part:

> [A]n entity * * * in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, * * * shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

Mapco and Burke argue that the NGLs in question are not property of the estate because the NGLs were stopped in transit pursuant to U.C.C. § 2–705(1),[9] which states in relevant part: "The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent[.]" When the goods are stopped in transit, the contract is executory, *In re Coast Trading Co.*, 744 F.2d 686, 693 (9th Cir.1984), and the debtor's contract right, not the goods themselves, is property of the estate. The estate has a right to the goods themselves only if the contract is assumed under 11 U.S.C. § 365(b). *In re Nat'l Sugar Ref. Co.*, 27 B.R. 565, 574 (S.D.N.Y.1983).

It is undisputed that Pester had not paid Mapco or Burke for the NGLs in question and that the product was in possession of Mid–America when Mapco and Burke learned of Pester's insolvency. Pester contends, however, that Mapco's and Burke's right to stop delivery of the NGLs under U.C.C. § 2–705(1) was terminated by U.C.C. § 2–705(2)(c), which states in relevant part: "As against such buyer the seller may stop delivery until * * * (c) such acknowledgement to the buyer by a carrier * * * as warehouseman[.]" In this case, there was acknowledgement to the buyer, Pester, by the carrier, Mid–America.[10] The issue is whether the carrier was "as a warehouseman."

"Acknowledgment by the carrier as a 'warehouseman' * * * requires a contract of a truly different character from the original shipment, a contract not in extension of transit but as a warehouseman." U.C.C. § 2–705 comment 3. A "warehouseman" is defined as "a person engaged in the business of storing goods for hire." U.C.C. § 7–102(1)(h). To fall within the U.C.C. § 2–705(2)(c) exception, therefore, there must be a contract, separate from any shipment contract, by which Pester engaged

Mid–America to store the NGLs in question for hire.

As noted by the bankruptcy court, these provisions are an extension of pre-Code law, under which goods in the possession of a carrier were generally subject to stoppage by the seller. 67A Am.Jur.2d *Sales* § 1059 (1985); *see, e.g., Coleman v. N.Y., N.H. & H.R. Co.*, 215 Mass. 45, 102 N.E. 92, 93–94 (1913); *Jeffris v. Fitchburg R. Co.*, 93 Wis. 250, 67 N.W. 424, 426 (1896). Goods were not subject to stoppage, however, when the carrier held the goods, pending complete and actual delivery, as agent of the buyer under a new agreement with the buyer. *Id.*

By "[e]xamination of the original shipment contract and the contract between Pester and Mid–America," the bankruptcy court found that Mid–America's acknowledgment to Pester "that it was holding the goods for Pester as a warehouseman * * * satisfied U.C.C. § 2–705(2)(c), and terminated the rights of MAPCO and Burke to stop shipment of the product." *Pester*, 66 B.R. at 813–14 (footnote omitted).

We review the findings of the bankruptcy court under the clearly erroneous standard, *Hanson v. First Bank*, 828 F.2d 1310, 1312 (8th Cir.1987); Bankr.R. 8013, under which we must accept the bankruptcy court's findings unless we are left with a " 'definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

Regarding the original shipment contracts between Mapco or Burke and Mid–America, the bankruptcy court stated:

The original shipment contracts in the transactions here were between either

---

**9.** The parties agree that the states of Iowa, Kansas, and Oklahoma all have possible connections to these transactions. All have adopted U.C.C. § 2–705 in similar form, making separate discussion of individual state law unnecessary. *See* Iowa Code § 554.2705 (1967); Kans.Stat. Ann. § 84–2–705 (1983); Okla.Stat.Ann. tit. 12A, § 2–705 (West.1963).

**10.** The bankruptcy court found "that Mid–America, by processing the PTO forms and confirming with MA32 forms, acknowledged that it held product for the buyer Pester." *Pester*, 66 B.R. at 811.

MAPCO or Burke and Mid–America. Those contracts required Mid–America to transport product to Conway, with the shippers to pay the freight charges. At the time the PTO forms were processed by Mid–America, the product had reached its destination. There were no freight charges to be paid before Pester could assert control over the goods. These circumstances, although not determinative in and of themselves, do tend to show that Mid–America was holding the product for Pester as a warehouseman.

*Pester,* 66 B.R. at 812.

■ Mapco and Burke argue that the mere arrival of the goods at the destination specified in the original shipment contracts is not evidence of a warehouse agreement between Mid–America and Pester. We agree. The arrival of the goods at their original destination may indicate the end of a carrier's true transportation function. For the purposes of stopping goods in transit, however, "[i]t makes no difference whether the goods are in the hands of the carrier qua carrier, or whether he puts them, at journey's end, in a warehouse." *Brewer Lumber Co. v. Boston & A.R. Co.,* 179 Mass. 228, 60 N.E. 548, 550 (1901). The right to stop goods in transit requires the additional showing of a separate warehouse agreement between the carrier and the buyer. *Id.; Jeffris,* 67 N.W. at 426.

■ Mapco and Burke also argue that it is irrelevant to the existence of a warehouse agreement that no freight charges remain unpaid on the original shipment contracts. Under pre-Code law, the existence of a carrier's lien for unpaid freight charges raised a presumption that the shipper held the goods as a carrier, and not under a warehouse agreement. *Brewer,* 60 N.E. at 550. The fact that there were no unpaid freight charges on the original shipment contracts merely negates this presumption; it is not affirmative proof of a warehouse agreement between Mid–America and Pester.

Regarding the agreement between Mid–America and Pester, the bankruptcy court stated:

The basic agreement between Mid–America and Pester was established by Mid–America's tariffs and trade practices. Under the agreements, the processing of a PTO form by Mid–America gave Pester certain rights. Pester could request delivery of the product through the pipeline, could pick up the product at Conway with its trucks, or could transfer the rights to the product to another entity. More important, Pester could store the product at Conway as long as it wanted until it decided to exercise one of its other three options. These facts negate any claim that Mid–America regarded Pester as a mere consignee of goods sold by MAPCO or Burke. Rather, they show that Mid–America was holding the goods until further order of Pester, and thus, was acting as warehouseman.

*Pester,* 66 B.R. at 812.

■ Mapco and Burke do not dispute that the processing of the PTOs gave Pester the rights enumerated by the bankruptcy court. Rather, they argue that these rights do not demonstrate that a separate warehouse agreement existed between Mid–America and Pester. Of the rights listed, only the right to store the NGLs at Conway is potentially relevant, and that right is relevant only if it was actually exercised pursuant to a separate warehouse agreement. As discussed above, title to the NGLs passed to Pester with the processing of the PTOs. The rights enumerated by the bankruptcy court merely reflect the change in control which results from the passage of title to Pester. As concerns the right of stoppage in transit, however, it is irrelevant whether the title to the goods in the carrier's possession is with the buyer or the seller. *In re Brio Petroleum, Inc.,* 800 F.2d 469, 473 (5th Cir.1986); *In re Marin Motor Oil, Inc.,* 740 F.2d 220, 225 (3d Cir.1984); *In re Murdock Mach. & Eng'g Co.,* 620 F.2d 767, 773 (10th Cir. 1980).

In addition, Mapco and Burke argue that the bankruptcy court's finding is clearly erroneous because Mid–America did not agree to store the NGLs in question for

hire. Regarding the "for hire" requirement, the bankruptcy court stated:

> A warehouseman is a person engaged in storing goods for hire. U.C.C. § 7–102(1)(h) (1977). The facts show that Mid–America stored product for its customers in its pipeline at Conway. The storage was in addition to the incidental storage necessary to properly operate the pipeline. Mid–America charged for customer storage; indirectly at first by credits against "demand" storage rights that had been purchased in conjunction with prior shipments, and then, after those rights were exhausted, by direct lease or demurrage charges. Thus, Mid–America at times provided storage for hire and, in doing so, acted as a warehouseman.

*Pester,* 66 B.R. at 811–12.

■ In determining whether a warehouse agreement existed, the relevant inquiry is whether Mid–America agreed to store the NGLs in question for Pester for hire. The fact that Mid–America had at times provided storage for hire for its customers [11] does not establish the existence of such an agreement between Pester and Mid–America. Moreover, our review of the record reveals that Pester had never paid Mid–America for storing NGLs in the pipeline, a fact that Pester never disputes.

■ Although the NGLs in question were initially transferred from Mapco and Burke to Pester's transfer storage account, Mid–America automatically transferred the product to Pester's transportation account as an accommodation to Pester.[12] Accordingly, Mid–America's tariff provisions [13] concerning the transportation account are relevant in this case.

Mid–America's tariffs state as follows:

Carrier will provide transportation storage for isobutane, normal butane, natural gasoline and ethane-propane mix for undelivered quantities remaining in the pipeline but nominated to be delivered within 30 days after receipt. Additional storage provisions must be made for quantities in the pipeline to be delivered after 30 days from receipt. Reference * * * Item 55, Demurrage.

Item 55(b) of Mid–America's tariffs states as follows:

> *Ethane-Propane Mix, Iso-Butane, Normal Butane and Natural Gasoline* —Volumes of product that Carrier is unable to deliver to the designated destination within 30 days of receipt, through no fault of Carrier, may be subject to demurrage of 1¢ per barrel per day.

A memo sent by Mid–America to its shippers further explained the transportation account:

> *Transportation* —is a new classification of inventory designed to allow a shipper to move ethane-propane mix, isobutane, normal butane and natural gasoline through the system with no storage charges.

> * * * * * *

> * * * Tenders to the transportation account will be limited, at the discretion of the pipeline, to those shipments that can be delivered within 30 days' time. The pipeline will make space available to hold this inventory at no cost to the shipper from the time of the receipt to the delivery. * * * Product held in this account will appear on the MA–32 "Transportation Inventory Report" and will be subject to transportation charges as outlined in the published tariff.

---

**11.** The bankruptcy court found that approximately 3% of Mid–America's revenue came from in-line storage charges. *Pester,* 66 B.R. at 806.

**12.** As noted in Burke's brief at 8 n. 4, 2,600 barrels of natural gasoline that were transferred from Burke to Pester on February 21, 1985, remained in Pester's transfer storage account on March 4, 1985, the date that Burke sought to stop the NGLs in transit. The record does not indicate why these NGLs were not automatically transferred to Pester's transportation account in accordance with the usual practice. Because it appears that these NGLs should have been transferred to the transportation account, and Pester has not argued otherwise, we have treated these NGLs as if they had been transferred to Pester's transportation account.

**13.** Mid–America is regulated by and files tariffs with the Federal Energy Regulatory Commission and the Kansas Corporation Commission. The tariffs are essentially identical.

These tariff provisions, as explained by Mid–America's memo, demonstrate that Mid–America designed the transportation account to facilitate movement of NGLs through the pipeline system and not as a mechanism to provide storage for hire. Tenders to the transportation account were expressly limited to those shipments that could be delivered within thirty days' time. Thus, if a shipment was delivered as expected, it would incur no storage charges in the transportation account. Any storage that may have been provided for NGLs in the transportation account was considered a "free service that's provided by Mid–America for its shippers." Dunwoody Deposition at 38 (deposition testimony of Mid–America's customer service manager).

The tariffs state that NGLs remaining in the transportation account for thirty days or less incur no storage charges.[14] Of the NGLs in question, only 5,000 barrels of isobutane had been in Pester's transportation account longer than thirty days at the time Mapco and Burke instructed Mid–America to stop the NGLs in transit.[15] NGLs remaining in the transportation account thirty days or less were clearly not subject to a separate agreement for storage for hire. An agreement cannot be implied in contravention of the express terms of a tariff. *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922) (tariff filed with Interstate Commerce Commission); *Paulson v. Greyhound Lines, Inc.*, 804 F.2d 506, 507–08 (8th Cir.1986) (same); *Ill. Cent. Gulf R.R. Co. v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588, 592 (5th Cir.1978) (same); *United States v. Assoc. Air Transp., Inc.*, 275 F.2d 827, 833 (5th Cir.1960) (tariff filed with Civil Aeronautics Board).

Moreover, a warehouse agreement requires mutual assent between the carrier and the buyer. The carrier cannot designate itself as the buyer's agent for the custody of the goods, nor can the buyer make the carrier its agent for custody without the carrier's consent. *In re N.Y. Furnishing Goods Co.*, 169 F. 612, 613 (2d Cir.1909); *Jeffris*, 67 N.W. at 426–27.

The above-quoted tariff language and the explanatory memo demonstrate that any storage Mid–America may have provided for NGLs in the transportation account was intended to be provided free of charge. The fact that the tariffs state that demurrage charges would accrue on NGLs left in the transportation account for longer than thirty days does not alter Mid–America's original intent to provide free storage in the transportation account. Mid–America did not agree to provide storage for hire in the transportation account after the thirty days had elapsed. Rather, the storage charges served to enforce the thirty-day limit and to encourage movement of products in the transportation account.

Pester argues that the Mid–America's transfer of the NGLs from the transfer storage account to the transportation account does not prove that the product was in transit. Thus, Pester concludes that the NGLs in its transportation account in excess of that designated for delivery were stored in the transportation account. This argument is misfocused, because storage

---

**14.** The bankruptcy court found that "Mid–America charged for customer storage; indirectly at first by credits against 'demand' storage rights that had been purchased in conjunction with prior shipments, and then, after those rights were exhausted, by direct lease or demurrage charges." *Pester,* 66 B.R. at 811. The demand storage rights referred to by the bankruptcy court, however, refer to product in the transfer storage accounts at Mid–America, not that in transportation accounts. *See Id.* at 807.

**15.** On February 25, 1985, Mapco instructed Mid–America to stop the following NGLs in transit: 10,000 barrels of normal butane, 5,000 barrels of isobutane, and 38,000 barrels of natural gasoline. Mid–America processed PTOs transferring these products from Mapco to Pester on February 13, 1985. *Pester,* 66 B.R. at 808.

On March 4, 1985, Burke instructed Mid–America to stop 15,000 barrels of isobutane and 10,000 barrels of natural gasoline in transit. Mid–America processed a PTO transferring 5,000 barrels of isobutane from Burke to Pester on January 24, 1985. Mid–America processed PTOs transferring the balance of the NGLs in question on various dates from February 13 through February 21, 1985. *Id.* Only 15,000 barrels of isobutane and 2,600 barrels of natural gasoline were actually stopped in transit by Mid–America.

itself is not the determinative factor. The storage must be pursuant to a separate agreement and must be for hire. The fact that Mid–America automatically transferred NGLs from Pester's transfer storage account to its transportation account is relevant in determining whether Mid–America agreed to store the NGLs in question for hire.

We conclude that the bankruptcy court's finding that a warehouse agreement existed between Pester and Mid–America is clearly erroneous. The factors cited by the bankruptcy court, even when viewed in totality, do not support its finding. In addition, Mid–America's tariffs and trade practices indicate that any storage Mid–America provided in the transportation account was intended to be provided without charge. In short, Mid–America did not agree to store the NGLs in question for Pester for hire.[16]

### III

■ On March 1, 1985, Mid–America advised Pester that it was withholding delivery of 3,260 barrels of Pester's normal butane inventory in accordance with Mid–America's common carrier lien rights under its published tariffs [17] and U.C.C. § 7–307.[18] The bankruptcy court held that the normal butane was subject to the turnover provisions of 11 U.S.C. § 542(a) regardless of the validity of the asserted lien. In making its determination, the bankruptcy court relied on *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.

2d 515 (1983), in which the Supreme Court held that property seized by a secured creditor prior to the filing of a Chapter 11 bankruptcy petition was subject to turnover under 11 U.S.C. § 542(a). *Id.* at 208–09, 103 S.Ct. at 2315–16.[19]

As discussed above, 11 U.S.C. § 542(a) states that property of the bankruptcy estate that the trustee may use, sell, or lease under section 363 shall be delivered to the trustee unless the property is of inconsequential value or benefit to the estate. In determining the scope of section 542(a), the *Whiting Pools* Court stated:

> As does all bankruptcy law, § 542(a) modifies the procedural rights available to creditors to protect and satisfy their liens. In effect, § 542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings. The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession.

*Id.* at 206–07, 103 S.Ct. at 2314–15 (footnotes and citations omitted).

Accordingly, 11 U.S.C. § 542(a), as interpreted by *Whiting Pools*, required Mid–America to turn over the 3,260 barrels of normal butane to Pester, even if the normal butane was subject to the asserted carrier's lien. The Bankruptcy Code has replaced Mid–America's right to possession

---

**16.** Because we have determined that no warehouse agreement existed between Mid–America and Pester, the NGLs in question were stopped in transit pursuant to U.C.C. § 2–705(1) and did not become property of Pester's bankruptcy estate. Accordingly, it is unnecessary for us to determine whether the bankruptcy court erred in its calculation of conversion damages.

**17.** Item 60 of Mid–America's tariffs provided in relevant part:

Carrier shall have a lien on all product in its possession belonging to Shipper or Consignee to secure the payment of any and all unpaid transportation, or any lawful charges that are due Carrier, that are unpaid by Shipper or Consignee, and may withhold such product from delivery until all unpaid charges shall have been paid.

**18.** U.C.C. § 7–307 states in relevant part:

(1) A carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) * * *.

\* \* \* \* \* \*

(3) A carrier loses his lien on any goods which he voluntarily delivers * * *.

**19.** In *Whiting Pools,* the Internal Revenue Service had seized the debtor's tangible personal property to satisfy a tax lien prior to the filing of the debtor's Chapter 11 bankruptcy petition. For this purpose the lien was considered a secured interest in the debtor's property. *Id.* at 202, 103 S.Ct. at 2312.

with other rights, such as the right to adequate protection.

■ Mid–America argues that the *Whiting Pools* decision is inapplicable because the carrier's lien it asserts by virtue of its published tariffs falls within an exception to the *Whiting Pools* decision, as indicated in the following footnote to the above-quoted text:

> One of the procedural rights the law of secured transactions grants a secured creditor to enforce its lien is the right to take possession of the secured property upon the debtor's default. A creditor's possessory interest resulting from the exercise of this right is subject to certain restrictions on the creditor's use of the property. Here, we address the abrogation of the Service's possessory interest obtained pursuant to its tax lien, a secured interest. We do not decide whether any property of the debtor in which a third party holds a possessory interest independent of a creditor's remedies is subject to turnover under § 542(a). *For example, if property is pledged to the secured creditor so that the creditor has possession prior to any default, 542(a) may not require turnover.*

*Id.* at 206 n. 14, 103 S.Ct. at 2314 n. 14 (citations omitted) (emphasis added). Mid–America notes that Item 60 of its tariffs provides that Mid–America has "a lien on all product in its possession * * * to secure the payment of any and all unpaid transportation * * * charges and * * * may withhold such product from delivery until all unpaid charges have been paid." Thus, Mid–America argues that Pester has effectively pledged the normal butane to Mid–America to secure payment of the unpaid transportation charges and that default is not a condition of Mid–America's possession.

We are not persuaded that the lien Mid–America asserts by virtue of its tariffs is a pledge as contemplated by the *Whiting Pools* footnote. "A pledge has been de-fined as a bailment of personal property as security for some debt or engagement, re-deemable on certain terms, and with an implied power of sale on default." 4 *Collier on Bankruptcy* ¶ 541.08[9] (15th ed. 1987). The normal butane in question was delivered to Mid–America for the purpose of transporting it to Pester's refinery, not as security for Pester's debt. The fact that Mid–America had a lien against the normal butane by virtue of the tariff provisions did not transform a delivery for the purpose of shipment into a pledge. Moreover, to inter-pret *Whiting Pools* as suggested by Mid–America would deprive Pester's bankrupt-cy estate of assets essential to its rehabili-tation effort, thereby frustrating the con-gressional purpose behind the reorganiza-tion provisions. *See Whiting Pools,* 462 U.S. at 208, 103 S.Ct. at 2315.

■ Mid–America also argues that it was not required to turn over the normal butane in question because it had the right to set off the normal butane against Pes-ter's unpaid transportation charges. A creditor may refuse to turn over property if the creditor possesses a valid right of setoff under 11 U.S.C. § 553. 11 U.S.C. § 542(b) (1982).[20] In order to defeat a debt-or's cause of action for turnover, however, the burden is on the creditor to establish a valid right of setoff under section 553. *In re Williams,* 61 B.R. 567, 570 (Bankr.N.D. Tex.1986). Our review of the record re-veals that Mid–America did not raise this issue during the bankruptcy court proceed-ings. Because it was not properly raised and litigated in the bankruptcy court and was not addressed by that court, we will not address the merits of Mid–America's setoff claim. *See In re Scaife,* 825 F.2d 357, 362 (11th Cir.1987).

■ Finally, Mid–America argues that the bankruptcy court's findings are clearly erroneous because Mid–America was put in the unworkable position of not being al-lowed to sell the normal butane to satisfy its lien and yet was assessed conversion

---

**20.** Section 542(b) states in relevant part:
[A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

damages of $72,909 in lieu of turning the product over to Pester. We disagree. The bankruptcy court resolved the asserted conflict by limiting the order of relief to monetary damages. *Pester*, 66 B.R. at 820. Mid–America is free to dispose of the normal butane as it sees fit.[21]

## IV

In addition to conversion damages, the bankruptcy court assessed punitive damages in the amount of $36,500, based on the following reasoning:

> Even if Mid–America has a valid lien upon the product retained, the product was property of the estate subject to turnover, *Whiting Pools*, 462 U.S. at 208–09, 103 S.Ct. at 2315, 76 L.Ed.2d at 524, and was protected by the automatic stay. 11 U.S.C. § 362(a). Mid–America was represented by general counsel and was aware that bankruptcy had been filed. Its actions were clearly in willful disregard of the rights of the bankruptcy estate. Punitive damages should be assessed.

*Pester*, 66 B.R. at 820.

Iowa law[22] on punitive damages can be summarized as follows:

> [Punitive] damages may be awarded where defendant acts maliciously, but malice may be inferred where defendant's act is illegal or improper; where the nature of the illegal act is such as to negative any inference of feeling toward the person injured, and is in fact consistent with a complete indifference on the part of defendant, liability for [punitive] damages is not based upon the maliciousness of the defendant but is based, rather, upon the separate substantive principle that illegal or improper acts ought to be deterred by the exaction from the defendant of sums over and above the actual damage he has caused.

*Syester v. Banta*, 257 Iowa 613, 133 N.W. 2d 666, 676 (1965) (quoting *Amos v. Prom, Inc.*, 115 F.Supp. 127, 136–37 (N.D.Iowa 1953)).

Mid–America acknowledges that punitive damages may be awarded for conversion if it is characterized by malice or willful disregard of the other party's rights. *Sandhorst v. Mauk's Transfer, Inc.*, 252 N.W. 2d 393, 399 (Iowa 1977). Mid–America contends, however, that its actions do not support a finding that it acted with malice or willful disregard of the rights of Pester's bankruptcy estate. We agree.

In making our determination, we recognize that the allowance of punitive damages turns on the facts peculiar to each case, *McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362, 368 (Iowa 1972); *Claude v. Weaver Constr. Co.*, 261 Iowa 1225, 158 N.W.2d 139, 145 (1968), and that the award of punitive damages is largely in the discretion of the trier of fact. *Beeck v. Aquaslide 'n' Dive Corp.*, 350 N.W.2d 149, 167 (Iowa 1984). Nonetheless, we must reverse when the party seeking punitive damages fails to demonstrate that the other party acted in "complete disregard" of its rights. *Kehm v. Proctor & Gamble Mfg. Co.*, 724 F.2d 613, 623 (8th Cir.1983) (addressing punitive damages under Iowa law).

Pester argues that the bankruptcy court's award of punitive damages should be upheld because Mid–America, which was represented by counsel, could not have reasonably believed that its asserted lien exempted it from the turnover provisions of 11 U.S.C. § 542(a) in light of the *Whiting Pools* decision. Although we have determined that section 542(a), as interpreted by *Whiting Pools*, required Mid–America to turn over the normal butane in question, the fact that Mid–America's argument was ultimately rejected by the courts does not alone justify an award of punitive damages. There is language in the *Whiting*

---

**21.** Because we affirm the bankruptcy court's determination that Mid–America's asserted carrier's lien would not exempt the normal butane from the turnover provisions of section 542(a), it is unnecessary for us to determine whether the lien was valid.

**22.** The bankruptcy court determined that Iowa law should govern the state law claim of conversion. This determination was not disputed.

*Pools* decision that arguably supports Mid–America's position. For example, the Court acknowledged that it did not "decide the outer boundaries of the bankruptcy estate," 462 U.S. at 205 n. 10, 103 S.Ct. at 2314 n. 10, and that it did "not decide whether any property of the debtor in which a third party holds a possessory interest independent of a creditor's remedies is subject to turnover under § 542(a)." *Id.*, at 207 n. 14, 103 S.Ct. at 2314 n. 14.

After a review of the record, we conclude that it was an abuse of discretion for the bankruptcy court to award punitive damages in this case.[23] *Compare Kehm*, 724 F.2d at 623 (punitive damages inappropriate where there is reasonable disagreement over the relative danger and utility of defendant's actions).

In summary, the district court's judgment is affirmed as to the assessment of $72,909 of conversion damages against Mid–America for withholding delivery of 3,260 barrels of Pester's normal butane inventory pursuant to its asserted common carrier's lien. The district court's judgment is reversed as to the assessment of punitive damages against Mid–America and to the extent that conversion damages were assessed against Mapco and Mid–America[24] for withholding the NGLs stopped in transit under U.C.C. § 2–705, and the case is remanded for further proceedings consistent with this opinion.

---

**23.** Our conclusion is unaffected by the fact that Mid–America's asserted lien may have been invalid or that other options were available by which Mid–America could have protected its interest.

**24.** Mid–America retained possession of the NGLs which Burke stopped in transit. Thus, Mid–America, not Burke, was assessed conversion damages for withholding 15,000 barrels of isobutane and 2,600 barrels of natural gasoline from Pester's bankruptcy estate.